**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-2152-MSK-MEH

DAVID HAMPTON and
TY MESSERLI, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

ROOT9B TECHNOLOGIES, INC.,
JOSEPH J. GRANO, JR., AND
KENNETH T. SMITH,

      Defendants.

---

**AMENDED CLASS ACTION COMPLAINT**

---

Lead Plaintiff David Hampton ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, *inter alia*: (a) review and analysis of relevant filings made by root9B Technologies, Inc. ("root9B" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, press releases, and television interviews; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who acquired root9B securities between October 17, 2014 and June 15, 2015, inclusive (the "Class Period"), seeking to recover damages caused by the defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are defendants Joseph J. Grano ("Grano"), and Kenneth T. Smith ("Smith") (collectively, the "Individual Defendants" or "Defendants"), the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

2.      root9B is a company that focuses on cybersecurity, offering consulting, training, and associated technology. During the Class Period, the Company's stock price was critical to its continued existence, as it needed additional financing to fund its continuing operations and a low stock price would make it difficult to raise equity or debt financings. Furthermore, during the Class Period, the Company's senior management were preparing to sell their own personal shares of its common stock. In an effort to inflate the Company's stock price, the Company and, its Chief Executive Officer, Defendant Grano, and its Chief Financial Officer, Defendant Smith, made misrepresentations to root9B investors regarding its so-called "proprietary hardware and software" and about the purported detection and prevention of a sophisticated hacking attack by a state-sponsored Russian hacking group, known as Sofacy and/or APT 28, among other names ("Sofacy/APT28"), and aimed at international and domestic financial institutions. These misrepresentations had the intended effect of inflating root9B's stock price during the Class Period, reaching a Class Period high of $2.51 per share. Furthermore, root9B successfully completed three equity financings during the first three months of 2015, raising over $11 million in proceeds from the sale of its stock at inflated prices.

3.      The misrepresentations were false because, according to the Company's own reports filed in 2015, it did not sell "proprietary" hardware and software but was a reseller of another company's product. Further, root9B did not detect a sophisticated state-sponsored Russian hacking attack but rather a routine "phishing" scheme operated by Nigerian scammers. Defendants Grano and Smith were fully aware of the non-proprietary nature of the hardware sold by root9B as well as the actual details of the hacking attack attributed to Sofacy/APT28 yet nonetheless made the misrepresentations to the public.

4.     The Defendants' fraud was revealed first by an article published on May 20, 2015 by cybersecurity expert Brian Krebs. In his article, Krebs disclosed for the first time that the Company had mischaracterized the type and sophistication of the hacking attack it had discovered. This article was shortly followed by an article published on *SeekingAlpha.com* that exposed the Company's lack of any proprietary hardware and software.  Following the publication of these two articles, root9B's stock price declined to $1.02 per share.

5.     As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's wholly-owned subsidiary, root9B LLC, is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone

communications and the facilities of the national securities exchange.

## PARTIES

10.     Court-appointed Lead Plaintiff David Hampton purchased root9B common stock during the Class Period and has suffered damages as a result.  Lead Plaintiff's certification was previously filed with the Court in connection with his motion for appointment as Lead Plaintiff, and are incorporated herein by reference.

11.     root9B is a Delaware corporation with its principal executive offices located at 4521 Sharon Road, Suite 300, Charlotte, North Carolina 28211.  The Company is headquartered in New York, New York and has 215 full-time employees (as of March 15, 2015).  Although headquartered in New York, the Company maintains its main operations office in Charlotte, North Carolina.   In addition to the New York and Charlotte locations, the Company has 14 other locations, including Colorado Springs, Colorado.  In November 2013, the Company, then named Premier Alliance Group, Inc. ("Premier Alliance"), acquired root9B LLC.  Thereafter, as part of a rebranding, Premier Alliance renamed itself root9B Technologies, Inc.  The Company's common stock is traded over-the-counter under the ticker symbol "RTNB."

12.     Defendant Grano served at all relevant times as the Company's Chief Executive Officer ("CEO") and as Chairman of the Company's Board of Directors.  Grano was appointed as CEO on May 20, 2014.  On May 20, 2014, the Company entered into an employment agreement with Grano for a term of three years. Pursuant to the terms of the employment agreement, the Company has agreed to pay Grano a base salary of $500,000 annually. Pursuant to his employment agreement, Grano shall also be eligible for a minimum guaranteed annual bonus of $500,000 and was issued an option to purchase an aggregate of 2,000,000 shares of the Company's Common

Stock, which will vest one third immediately, one-third after one year and one-third after two years.  As of April 10, 2015, Grano beneficially owned 7,368,833 shares or 9.7% of the Company's issued and outstanding common stock.

13.     Defendant Smith served at all relevant times as the Company's Chief Financial Officer.  On January 1, 2014 the Company entered into a one-year employment agreement with Smith. The employment agreement provided for $180,000 annual base salary. Mr. Smith also received an option to purchase an aggregate of 350,000 shares of common stock which will vest over a four year period.  As of April 10, 2015, Defendant Smith beneficially owned 450,000 shares of common stock issuable upon exercise of stock option issued in January 2014 upon him becoming the CFO and in March 2015. As of April 10, 2015, Smith's benefical ownership equaled 0.6% of the Company's outstanding shares.   On November 11, 2015, Smith unexpectedly submitted his resignation as CFO of root9B effective November 20, 2015.  Upon information and belief, Smith resigned as a result of the fraud alleged herein.

14.     Grano and Smith (the "Individual Defendants"):

(a)     directly or indirectly participated in the management of the Company;

(b)     was directly or indirectly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

5

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     root9b is liable for the acts of Grano, Smith, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

16.     The scienter of Grano, Smith, and other employees and agents of the Company are similarly imputed to root9b under respondeat superior and agency principles.

17.     Non-party Eric Hipkins ("Hipkins") has served at all relevant times as the CEO of the Company's wholly-owned subsidiary root9B LLC.  Hipkins was the founder, chairman, CEO, and principal owner of root9B LLC at the time Premier Alliance acquired root9B LLC.  On November 22, 2013, root9B LLC entered into a two-year employment agreement with Hipkins with a base salary of $200,000 annual base salary with additional options and stock awards that may be issued upon certain milestones and as determined by the Board of Directors.  As of April 10, 2015, Hipkins beneficially owned 1,998,214 shares or 2.8% of the Company's issued and outstanding common stock.

18.     Non-party John Harbaugh ("Harbaugh") has served at all relevant times as the Chief Operations Officer of the Company's wholly-owned subsidiary root9B LLC.  Harbaugh was appointed as root9B LLC's COO in September 2014.

6

## BACKGROUND

### *Root9B LLC and Premier Alliance Group, Inc.*

19.     root9B LLC is headquartered in Colorado Springs, Colorado and was founded in 2011 by Hipkins.  root9B LLC is a provider of cyber security and advanced technology training capabilities, operational support, and consulting services.

20.     On November 22, 2013, root9B LLC was acquired by a publically-listed company, Premier Alliance in a cash and stock transaction.  Pursuant to the merger agreement, the Company acquired all of the assets of root9B LLC for $347,886 in cash and 2,241,935 restricted shares of the Company's common stock valued at $1,390,000.  Furthermore, as part of the acquisition, the Company entered into an employment agreement with Hipkins.

21.     In its November 25, 2013 press release, Premier Alliance touted root9B LLC "combines the latest in security technology with defensive tactics development and extensive mission experience" and that the services that root9B LLC provides were "vital" and "a key enhancement to Premier Alliance's value proposition as cyber-security has a direct impact on risk and profitability."

22.     On October 17, 2014, Defendant Grano sent a letter to the Company's stockholders announcing that the Premier Alliance intended to re-brand itself into root9B Technologies, Inc. as part of its repositioning to its "increased focus and commitment to cybersecurity and regulatory risk mitigation."

23.     On December 1, 2014, a little over one year after root9B LLC was acquired, Premier Alliance announced via press release that it was re-branding itself as root9B Technologies, Inc.  In this press release, the Company announced that "[t]his re-branding initiative is consistent

with the Company's previously announced strategic shift to accelerate the industry-leading capabilities of its wholly-owned cybersecurity subsidiary root9b, and to focus primarily on cybersecurity and regulatory risk mitigation."

### The Company's Cyber Solutions Operating Segment

24.     root9B describes itself as a "provider of cyber security, regulatory risk mitigation, and energy solutions" with its "services and solutions target mitigating risk, assisting with compliance, and maximizing profits by addressing these core areas for businesses, primarily cyber security, regulatory compliance, risk mitigation and energy management related initiatives."

25.     The Company provides these services over three operating segments: Cyber Solutions, Business Advisory Solutions and Energy Solutions. The Company evaluates the performance of its business at the segment level.

26.     The Company's Cyber Solutions business segment is operated through a wholly-owned subsidiary, root9b LLC, and is headquartered in Colorado Springs, Colorado.

27.     root9B describes its Cyber Solutions operating segment as a "provider of cyber security and advanced technology training capabilities, operational support and consulting services" and operates from its offices in Colorado Springs, Honolulu, New York and San Antonio. The Company states that its services span from "operations assessments, analysis and testing, to cyber training, forensics, exploitation, and strategic defense planning."

28.     In the Company's Form 10-K/A filed on March 31, 2015 with the SEC, the Company explained its strategy and its focus on the Cyber Security operating segment as:

> Our business focus is to work with the top levels of corporations to address major initiatives that fall under governance, risk and compliance (GRC) areas. Within GRC, the key emphasis today is around risk related to cybersecurity.  With our cyber group, root9B, we take a new approach to combatting cyber activity, using a full solution encompassing active

adversarial pursuit (HUNT), cybersecurity and intelligence training, operational support, and associated technology and tools.  In 2015, we are building a HUNT operations center where we will be able to conduct and provide remote HUNT services to our customers, which, we believe, offers a competitive advantage.  We believe a full spectrum solution is needed to mitigate risk associated with cyber threats.

29.     For the year ended December 31, 2014, root9B derived 20% of its revenue from Cyber Solutions, 64% from Business Advisory Solutions, and 16% from Energy Solutions. root9B has disclosed that as of March 2015, its clients include, among others, Fortune 500 companies such as Cisco, Duke Power, Bank of America, and PNC Bank.   The Company is heavily dependent on its five largest customers for its revenues, as during 2014 and 2013, the five largest customers comprised approximately 34% and 47% of root9B's total revenues, respectively.

30.     The Company's Cyber Solutions segment's revenues in 2014 was approximately $4,076,000 and was attributable to the acquisition of root9B LLC.

31.     As part of the Company's repositioning into cyber security, the Company invested in 2014 in building up the Cyber Solutions segment, primarily by hiring new resources with specialized cyber security skills and extending its infrastructure.  In 2014, the Company employed only six subject-matter experts which it increased to 43 by August 14, 2015.   As of August 25, 2015, root9b LLC had approximately 45 employees, of which 25 employees were based at the Colorado Springs headquarters.

32.     The Company continues to emphasize the strategic importance of its Cyber Solutions segment.  In its annual report filed on March 31, 2015 with the SEC, the Company stated that the Cyber Solutions segment "continues to ramp up and is planned to be a key revenue growth driver for the Company in 2015 and future years."

## FALSE AND MISLEADING STATEMENTS

33.     During the Class Period, the Defendants made materially false and/or misleading statements and/or omissions that: (i) the Cyber Solution's hardware offering was "proprietary" and differentiated the Cyber Solutions business segment from its competitors; and (ii) the discovery of planned cyberattack against financial institutions that the Company repeatedly claimed originated from Russian state-sponsored hacking group commonly known as Sofacy/APT28.

### October 17, 2014 – Form 8-K

34.     On October 17, 2014, Defendant Grano sent a letter to the Company's stockholders. This letter was later filed with the SEC as an exhibit to a Form 8-K.  Grano's letter to stockholders discussed Premier Alliance's intention to reposition Premier Alliance and root9B LLC's purported proprietary hardware and software.  In relevant part, the stockholder letter stated:

Dear Shareholder,

Since being named Chairman and CEO of Premier Alliance Group, Inc. in May of this year, I have had the opportunity to evaluate the firm's value propositions and strategies. As I hope you are aware, our stock price has moved from a low of $0.43 to its current trading range of slightly more than double that.

We believe this positive market reaction is due primarily to our November 2013 acquisition of our cybersecurity firm, root9B. Every day we read about another cyber-attack at one of our nation's largest companies. Around the world, individuals, companies and government entities have been victims of cyber-theft of intellectual property (IP), client identities, and sensitive financial data. In our estimation, the demand for cybersecurity expertise will grow exponentially in order to meet these challenges. We firmly believe that root9B is in an optimal position to assist current and future clients in assessing and addressing these threats and will provide a sustainable growth engine for our company.

Our root9B subsidiary is differentiated from the competition in four critical areas.

First, the firm has attracted many of the country's most highly recognized subject matter experts, most of whom have served within the NSA (National Security Agency).

Second, root9B **has proprietary hardware and software designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers.**

Third, root9B utilizes an advanced integrated strategy known as active adversarial pursuit that employs hunt capabilities. We believe root9B's approach represents a game changer in cyber defense. Its *hunt* methodologies allow our clients to execute interactive cyber operations and proactively search for malicious activities *within their own networks.* In essence, in addition to "KYC," or "know your customer," today's world requires you to "KYA," or "know your attacker."

Fourth, root9B is world-renowned for its training curriculum and capabilities, as evidenced by our contractual agreement with Boeing to provide global cybersecurity training and the advanced courses and certifications we provide for mission critical Department of Defense (DOD) personnel.

We strongly believe that root9B's expertise, game changing approach, technological edge and market potential warrant increased focus, emphasis and resources. Therefore, we intend to reposition our firm to accentuate our increased focus and commitment to cybersecurity and regulatory risk mitigation. We will begin the repositioning by renaming our firm root9B Technologies, Inc. We expect the name change, along with a new stock symbol, to become effective within the next 30 days and will notify you accordingly. Our core competencies within our Business Advisory Solutions Group are ideally positioned to assist corporations in dealing with dramatically increased regulation, such as Sarbanes Oxley and Dodd Frank.

35.     The above bold-faced statement referenced in paragraph 34 was materially false and misleading because it misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, which were known to the Company and Defendant Grano or recklessly disregarded by them. Specifically, the Company and Defendant Grano made false and/or misleading statements and/or failed to disclose that: (1) the Cyber Solution's hardware offering was not proprietary and did not differentiate the Cyber Solutions business segment, but rather was a product that root9B acted as a reseller; and (2) this hardware was not specifically "designed to combat the new methodologies being utilized by state-sponsored and sophisticated

individual hackers".

**November 14, 2014 – Form 10-Q**

36.     On November 14, 2014, the Company (still named Premier Alliance) filed its Form

10-Q with the SEC for the fiscal quarter ended September 30, 2014 ("November 14, 2014 Form

10-Q").  The November 14, 2014 Form 10-Q was signed by Defendants Grano and Smith.

37.     In the November 14, 2014 Form 10-Q, the Company discussed the Company's

revenues for its Cyber Solutions business segment. In relevant part, the Company stated:

> ***Revenue for the CS segment*** for the quarter ended September 30, 2014, which is
> generated from cyber security advisory and technical services was $1,576,939, and
> was 100% incremental as compared to the quarter ended September 30, 2013, ***and
> is entirely attributable to Root9B***. During the third quarter of 2014 the Company
> continued to invest in building up the CS segment, primarily by hiring new
> resources with specialized cyber security skills and extending the
> infrastructure. The segment continues to ramp up and is planned to be the key
> revenue growth driver for the Company over the next several years.

November 14, 2014 Form 10-Q, at 20 (emphasis added).

38.     Furthermore, the November 14, 2014 Form 10-Q stated:

> We believe the demand for cyber security expertise and solutions will grow
> significantly and that this will continue to cause change related to solutions and
> regulation. root9b, our cyber security segment is differentiated in four ways. First,
> we have attracted many of the country's most highly recognized subject matter
> experts, most of whom have served within the NSA (National Security Agency).
> ***Second, root9B has proprietary hardware and software designed to combat the
> new methodologies being utilized by state-sponsored and sophisticated individual
> hackers.*** Third, root9B utilizes an advanced integrated strategy known as active
> adversarial pursuit that employs hunt capabilities. Fourth, root9B is renowned for
> its training curriculum and capabilities regarding cyber security. The core
> competencies in our Cyber and Business Advisory segments are positioned to
> address the challenges and provide solutions related to cyber security, regulation
> and risk mitigation.

November 14, 2014 Form 10-Q, at 18.

39.     Attached to the November 14, 2014 Form 10-Q were Sarbanes-Oxley Act of 2002

12

("SOX") certifications signed by Defendants Grano and Smith falsely attesting to the accuracy of the November 14, 2014 Form 10-Q.

40.     In their SOX certifications, Defendants Grano and Smith each certified:

1   I have reviewed this Quarterly report on Form 10-Q of Premier Alliance Group, Inc.;

2   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstance under which such statements were made, not misleading with respect to the period covered by this report;***

3   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the period presented in this report.

4   I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

13

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5   I have disclosed, based on my most recent evaluation, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

41.    The above bold-faced statements referenced in paragraphs 38-40 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, which were known to the Company and Defendants Grano and Smith or recklessly disregarded by them. Specifically, the Company and Defendants Grano and Smith made false and/or misleading statements and/or failed to disclose that: (1) the Cyber Solution's hardware offering was not proprietary and did not differentiate the Cyber Solutions business segment, but rather was a product that root9B acted as a reseller; and (2) this hardware was not specifically "designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers".

### March 31, 2015 – Form 10-K/A

42.    On March 30, 2015, the Company filed its Form 10-K with the SEC for the fiscal

14

year ended December 31, 2014.

43.     On March 31, 2015, the Company filed its Form 10K/A with the SEC ("2014 Form 10-K").  The 2014 Form 10-K was signed by Defendants Grano and Smith.

44.     In the 2014 Form 10-K, the Company further discussed the Company's repositioning and the drivers of the Company's strategic change and that the Company's had "differentiated" "proprietary hardware" that was "designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers."  Specifically, the 2014 Form 10-K stated:

> In the latter half of 2014, the Company launched and announced the repositioning of the Company's business and adjustment to its strategy to focus on cybersecurity and regulatory risk mitigation. Effort on the strategic and structural changes to the Company continue.  In support of this strategy, in February 2015, the Company acquired IPSA International and expanded capabilities related to regulatory risk mitigation as discussed previously in "Other Developments". This strategic change in focus is driven by several factors: 1) our expertise, capabilities and proprietary solutions in the cyber security sector, 2) the growing opportunity related to cyber security, regulation and risk as indicated above, and 3) our overall ineffectiveness related to our targeted energy solutions.  We believe the demand for cyber security expertise and solutions will grow substantially and that this will continue to cause change related to solutions and regulation.  root9B, our cyber security segment is differentiated in four ways.  First, we have attracted many of the country's most highly recognized subject matter experts, most of whom have served within the National Security Agency. ***Second, root9B has proprietary hardware and software designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers***. Third, root9B utilizes an advanced integrated strategy known as active adversarial pursuit that employs HUNT capabilities, in which cyber threats are identified before or during an attack rather than discovering the attack after it has taken place.  We believe this approach represents a game changer in cyber defense*.* During 2015 we are building an Adversarial Pursuit Operations Center to expand our ability to deliver these services as well as continuing to develop our proprietary products.  Fourth, root9B is known for its training curriculum and capabilities regarding cyber security.  The ongoing trend regarding cyber security is also moving into the regulatory/compliance arena beyond what it has traditionally been.  We see these trends being a good fit for our business model although we cannot assure that we can fully take advantage of the same.

2014 Form 10-K, at 30 (emphasis added).

45.     The 2014 Form 10-K was signed by Defendants Grano and Smith.  Attached to the

2014 Form 10-K were SOX certifications signed by Defendants Grano and Smith falsely attesting

to the accuracy of the 2014 Form 10-K.

46.     In their SOX certifications, Defendants Grano and Smith each certified:

1    I have reviewed this annual report on Form 10-K of root9B Technologies, Inc.;

2    ***Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstance under which such statements were made, not misleading with respect to the period covered by this annual report***;

3    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the period presented in this annual report.

4    I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

        (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

16

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5   I have disclosed, based on my most recent evaluation, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

47.   The above bold-faced statements referenced in paragraphs 44-46 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, which were known to the Company and Defendants Grano and Smith or recklessly disregarded by them. Specifically, the Company and Defendants Grano and Smith made false and/or misleading statements and/or failed to disclose that: (1) the Cyber Solution's hardware offering was not proprietary and did not differentiate the Cyber Solutions business segment, but rather was a product that root9B acted as a reseller; and (2) this hardware was not specifically "designed to combat the new methodologies being utilized by state-sponsored

and sophisticated individual hackers".

## **May 12, 2015 – Press Release**

48.     On May 12, 2015, the Company issued a press release entitled, "root9B Uncovers

Planned Sofacy Cyber Attack Targeting Several International and Domestic Financial Institutions"

(the "May 12 Press Release") which states:

> *Root9B . . . announced today that it had uncovered plans by the Sofacy group (APT28), a known Russian hacking organization, to target several international financial institutions. While performing surveillance for a root9B client, the company discovered malware generally associated with nation state attacks. It is the first instance of a Sofacy or other attack being discovered, identified and reported before an attack occurred.*
>
> *"Our team did an amazing job of uncovering what could have been a significant event for the international banking community," said Eric Hipkins, root9B Chief Executive Officer. "*We've spent the past three days informing the proper authorities in Washington and the UAE, as well as the CISOs at the financial organizations."
>
> The banks identified as potential targets in the pending attack are TD Bank, Bank of America, UAE Bank, and other organizations including the United Nations Children's Fund, United Bank for Africa and Regions Bank.
>
> "While none of the targeted organizations are clients of root9B, we felt it imperative to disclose the findings to them, and as broadly as possible to the security community," said Hipkins. "In previous instances, attacks have been dissected after the event. Our HUNT platform delivers a proactive defense protection capability to identify, pursue and mitigate cyber threats. This is a first in our industry."
>
> (Emphasis added).

49.     The above bold-faced statements referenced in paragraph 48 were materially false

and misleading because, as discussed in more detail in paragraph 78, there is no link between the

threat identified by root9B and Sofacy/APT28. Instead, the threat is likely the result of

unsophisticated Nigerian hackers that were first identified by a volunteer group in 2008.

## May 12, 2015 – The APT28 Report

50.     In conjunction with the May 12 Press Release, the Company also issued a report

entitled "APT28 Targets Financial Markets: Zero Day Hashes Released" (the "APT28 Report").

A link to the APT28 Report was embedded in the May 12 Press Release.

51.     The APT28 Report begins by discussing the Russian hacking groups, describes how

the Russian government is tied to certain of these hacking groups, and characterizing the threat of

Russia and its state-sponsored cyberattacks through hacking groups such as Sofacy.  Specifically,

the APT28 Report begins:

> Cybersecurity experts are increasingly concerned about the threat posed by Russian
> hacking groups. Besides well-known events such as the attacks against Estonia,
> Georgia, and Ukraine; recent headlines have seen Russian hacking syndicates
> credited with targeting NATO officials at conferences, stealing hundreds of
> millions from banks, and successfully penetrating the White House unclassified
> computer network. The increase in cyber-exploits is also accompanied by a much
> more aggressive Russian foreign policy, which has seen them invade Ukraine and
> literally seize control of sovereign territory in Crimea. *So it should not surprise
> anyone that just as nuclear capable Russian bombers are increasingly
> penetrating foreign airspace, their cyber-warriors appear to be ramping up their
> intrusions as well. But this time, perhaps for the first time, root9B has managed
> to find where they were hiding and identified effective defenses against their
> intended attacks. This is what happened in late April and early May of this year.*
>
> *Our firm of cybersecurity experts, staffed by veterans from the United States
> Department of Defense, identified suspicious activity within one of our client's
> networks; a threat which on closer inspection bore the unique signature of a
> group of Russian hackers well-known in the cyber-security industry.* As Cyber
> Threat analysts continued to follow the indicators, they uncovered a global attack
> in the making, and took steps to protect not only our clients, but other identified
> victims as well.
>
> *Sofacy, Sednit, Sourface, APT-28, and a host of other names are all used to
> describe this particularly prolific and superbly talented group of Russian
> hackers, which has strongly suspected ties to Russian intelligence services.* In the
> last year alone Russian hackers have reportedly stolen up to 900 million dollars
> from banks around the world. Over the past three to five years they have built the
> largest botnets ever discovered, and stolen the log-in and password credentials to

literally tens of millions of online accounts. Well known for their ability to infiltrate and remain undiscovered in networks for long periods of time, they may be the most successful group of hackers in the world.

Whereas previous attacks have been attributed and analyzed only after they have run their course, this *was the first and only known Sofacy attack to be discovered, identified, and reported* – all before it could even begin! The analysts and *tools that enabled this to happen are unique and proprietary*. This report documents the first ever operation to use threat intelligence and adversary tactics to discover and reveal the prepositioning of *Sofacy zero-day malware*. This document also includes the reporting of previously unknown malware indicators and hashes.

**The Threat**

Russian President Vladimir Putin recently described the Internet as "an invention of the CIA." But the group most widely associated with his government dominates the world of industrial scale hacking. First discovered circa 2007 using security vulnerabilities in Microsoft Windows, Sofacy has gone on to develop and launch truly enormous attacks exploiting numerous applications including Adobe's Acrobat, Microsoft Excel, and others. Some attacks have focused on the sorts of targets that seem likely to be of interest to Russian intelligence services. NATO, defense industry corporations, and government domains of states opposed to Russia on various issues have all been, at times, victims of Sofacy. At other times large banks and private corporations have been hit hard by Sofacy exploits, at a cost of hundreds of millions to the victims. Sofacy's choice of targets has historically been an interesting mixture that has fueled an ongoing debate over whether the group is criminal in nature, or actually an agent of a nation-state. Most cybersecurity analysts have concluded that the group's affiliation with the Russian government is undeniable. But there are detractors. Those who argue loudest against such assertions cite Sofacy's prolific criminal profit as evidence that they are most likely not agents of the Federal Security Service (FSB); while others suppose that the crimes committed bearing Sofacy's unique signatures is a perfect cover behind which the Russian Government prefers to remain.

52.     The APT28 report then goes to describe root9B as "The Defenders" and touts RTNB's "proprietary methods of discovering and dealing with adversaries." The APT28 Report also touts the employees' qualifications before an in-depth discussion concerning the discovery of the purported APT28 attack.

53.     The APT28 Report then begins the actions it undertook to uncover the purported

Sofacy planned attack. The APT28 Report explains that at the end of April 2015, root9B analysts "conducting routine security analysis to explore and discover new and emerging cyber threats" when these "Threat Analysts" discovered what appeared to be a targeted "spear phishing" domain aimed at a financial institution.

54.    The APT28 Report goes on to describe that the server that the spear-phishing domain was found on was "a bad actor . . . *generally associated with malware used in nation state attacks*" and that RTNB's analysts discovered new pieces of malware whose "*malicious code bore specific signatures that have historically been unique to only one organization, Sofacy.*" Specifically, the APT28 Report stated:

> During the end of April 2015, root9B analysts were conducting routine security analysis to explore and discover new and emerging cyber threats. Threat Analysts discovered what appeared to be a targeted spearfishing domain aimed at a financial institution. The server it was found on raised even more questions, because although security experts knew the server as a bad actor, it was generally associated with malware used in nation state attacks. As analysts continued their work they discovered several more pieces of new malware. *The malicious code bore specific signatures that have historically been unique to only one organization, Sofacy*. *This malware was pointing at a spearfishing domain registered to impersonate a Middle Eastern financial institution and the domain registration details did not match normal Sofacy operational signatures.* That said, the malicious software certainly did. Members of root9B's operations team conducted HUNT operations, remotely deploying their live memory capability across the client's proprietary networks to analyze known techniques that can evade the most efficient security products on the market. root9B's capability parses live memory while the system is running and looks for indicators of advanced tactics such as code injection or security product bypassing. Using a combination of standard industry tools and proprietary techniques our analysts began to develop a larger picture of what was taking place. *Immediately, root9B identified that preparations were being made for a larger scale attack similar to previous Sofacy attributed exploits, and the attack was still in the preparatory stages*. To our analysts, this was a rare opportunity. "It is rare enough to learn of an attack of this potential magnitude in advance, but to have all of the information necessary to stop it before it begins is unprecedented," said an unnamed root9B analyst.

55.    The APT28 Report then discusses the "bad actor" server and the fake website

domains registered to this bad actor.  The report continues to discuss, that root9B analysts saw that certain of these fake website domains were moved to other servers and ultimately found seven domains that were meant to look like the real domain of the Commercial Bank International of the United Arab Emirates ("CBI") (e.g., the real domain of CBI is CBIUAE.com while one of the fake domains listed in the APT28 report that was uncovered was CBIUAEBANK.com).

56.   The APT28 Report then states:

Evidence of intrusion within client networks pointed to a specific server, CARBON2U.COM, that had been previously linked to malicious activity and identified by other security firms as part of the infrastructure utilized by the Sofacy group. Analysts studied the remaining domains registered on that server, and initially noted that one in particular, CBIUAEBANK. COM, appeared to be a fake version of CBIUAE.COM, the actual domain of the website of Commercial Bank International of the United Arab Emirates. Further analysis lead to even more suspicion, and those suspicions grew even stronger as they watched another comparable domain created, CBIUAEBN.COM. As analysts passively monitored CARBON2U. COM, they observed as the apparent fake domains they were monitoring migrated to other servers; first to SITE4NOW.NET and later to OK2HOST.COM. This gave analysts two more suspicious servers to study, and added considerable data analysis.

root9B analysts began to dissect the data at hand to identify common tactics, techniques, and procedures used by the adversaries which could provide further information about the planned hack, including information about potential attack vectors. As root9B analyzed increasing amounts of metadata and associated indicators, they were able to identify a very unique signature consistently used by someone involved in setting up the hack. Investigating the apparently fictitious list of personas used to create and register domains, a pattern emerged. Due to the nature of this unique signature, root9B is in the process of further documenting and reporting to the proper authorities.

The discovery of the hacker's single mistake in tradecraft was indeed a powerful catalyst, and lead to the discovery of a treasure trove of new indicators. The new discoveries included evidence related to past attempts to launch attacks against many of the same targets, including the aforementioned Commercial Bank International. What the analysts eventually had was a very detailed view of the specific tactics employed by this adversary; and a window into a plan for a hack that was even larger than originally believed, much larger. Where initially they had only a single fake domain pointed at CBI, now there were six additional domains,

all used to target this single victim. Many of the fake domains appeared to have been created by several of the same accounts, and open source analysis indicated that the names listed for the person registering the addresses was clearly fictitious; probably chosen at random from the Internet.

57.     The APT28 report further discusses that "[m]any of the fake domains appeared to have been created by several of the same accounts" and the personas listed as registering these domains appeared to be fictitious.   Based upon its analyst's investigation, the APT28 Report concludes:

> The analysts at root9B understand better than anyone the significance of this analysis. As far as any of them know, and it stands to reason that they would, there has never been a case of a large-scale attack utilizing numerous zero-day exploits that were so thoroughly mapped in advance before. The analysts who worked this case now understand that the attackers began preparations for this campaign in June 2014, a full eleven months ago. *The design of the hack bears striking similarity to the very exploits that have made Sofacy so feared and respected*. *At least nine months of meticulous preparation coupled with one slip of tradecraft has enabled root9B to inform potential targets prior to the execution of the strategy.*

(Emphasis added).

58.     The APT28 Report continues on to discuss how root9B found numerous consistencies of the tactics used by the hackers, specifically that the hackers used fictitious names to list as the owners of the websites  and all used addresses on the same street in DeSoto, Texas. The APT Report stated that by using the names and addresses it confirmed that most of these addresses did not exist.   The APT28 Report concludes "[*t]his became a key signature of the hackers; a common thread which unraveled all of Sofacy's careful preparation.*" More specifically, the APT28 Report states:

> With the exception of CBIUAEONLINE.COM, there are numerous consistencies amongst the tactics employed by the hackers. The group generates what are likely fictitious personalities as the "owners" of each of the fake domains. All of the fictitious personalities list the same street address. While they change names and house numbers for them, they all reside on Cloverdale Lane in DeSoto, Texas.

23

Analysts noting the similarity did not have to visit the street to determine that it was unlikely that they each resided in different homes on the same street. In fact, even the house numbers changed only slightly from one domain to the other. In addition to the links between the addresses, streets, and names, they found that the registrant phone numbers were also very closely related. The only differences in registrant data from one domain to the next involved very slight modifications to the country codes or by changing the third digit. This kind of flaw in tradecraft allowed for further detailed network analysis.

Further analysis of the street addresses enabled root9B to correlate the address and personas listed as registrants via public records, doing so showed that most of these addresses did not even exist, and the few addresses confirmed to physically exist did not have residents with the names listed. ***This became a key signature of the hackers; a common thread which unraveled all of Sofacy's careful preparation.*** Often those wanting to generate a free and anonymous email address will use a false name and address in order to conceal and preserve their true identity**.**

59.     The APT28 Report continued to list the various fake domains that were made to be similar to the CBI's real website domain at CBIUAE.com.  The APT28 Report listed numerous of the fake domains, such as CBIBUAE.COM, CBIUAEONLINE.COM, CIBUAEONLINE.COM, and listed the domain's creation date and the name server.  Thereafter, the APT28 went on to state:

Correlating the increasing amounts of information, root9B analysts have determined that the adversary responsible for the initial attack in June 2014 was almost certainly the same, or very closely-related to the entity responsible for creating at least two of the domains in April 2015. The same person was ostensibly responsible for registering the two most recent domains (CBIUAEBN.COM and CBIUAEBANK. COM). Analysts from root9B now believe that the adversary most likely selected this name through an internet search, and that these personas, while possibly real names, are not the true names of those individuals associated with the preparations for this attack.

60.     The APT28 Report continues on to state:

While root9B's discovery began with servicing their own customers, their analysis has revealed an adversary pattern that has enabled the identification of previously unknown target vectors. As root9B analysts continued to peel back the layers, ***it became more apparent, that this attack was likely associated with Russian intelligence.*** The targets included multiple major financial institutions, as well as the international government domain. In addition to identifying targets, root9B analysts also discovered indicators of malware, the analysis of which revealed

several zero-day threats and their corresponding "hashes." Each new discovery revealed more information, enabling a more complete picture to emerge. root9B discovered and analyzed numerous other domains being staged or recently created for the malicious cyber operation. Also discovered was a fatal flaw in the hackers tradecraft that lead to a major breakthrough. Research based on the adversary's flaw in tactics showed that there was a strong likelihood of two distinct subgroups, each of which utilized unique methods of cover for their activity. Each of the two groups also had a unique theme to their target sets. The first seemed to focus on military, diplomatic, and media targets, and relied on the cover of proxies and private domain registrations. As documented earlier, the other group used deliberately falsified personalities, all of which claimed to be American citizens, and focused on financial and banking targets. Understanding the scope of the newly staged malicious operations, root9B also tipped the information to the appropriate international and domestic government authorities.

61.     Finally, the APT28 concludes:

While the continued vector of the attack remains unclear, root9B assesses that it will most likely be a spear-phishing campaign. This attack vector will likely use a well-crafted email containing either a malicious file or web hyperlink to what recipients believe is the actual website; but is instead a fake landing page. In typical attacks of this nature, once users navigate to the link, visitors are prompted to supply account credentials and personal information under the false assumption that they are communicating with their bank via a secure link. ***However, it is possible, that the Sofacy group could utilize this server as a vector to deliver malicious code to the banking victims in an attempt to obtain access to the network.*** As of October 2014, the Symantec Corporation had reported an increased use of spear-phishing emails containing malware  specifically  targeted  against  financial institutions.

62.     The above bold-faced statements referenced in paragraphs 51 to 61 were materially false and misleading because, as discussed in more detail in paragraph 78, there is no link between the threat identified by root9B and Sofacy/APT28. Instead, the threat is likely the result of unsophisticated Nigerian hackers that were first identified by a volunteer group in 2008.

63.     In response to the Company's May 12 Press Release and the APT28 Report, as well as additional publicity that resulted from these statements, the Company's common stock skyrocketed over the next several days from its closing price of $1.77 on May 11, 2015 up to an all-time trading high of $2.51 on May 19, 2015 during intra-day trading.

**May 14, 2015 – The Fox Business Interview**

64. On May 14, 2015, Fox Business originally aired an interview between Fox Business reporter Neil Cavuto ("Cavuto") and Defendant Grano and Harbaugh (the "May 14, 2015 Fox Business Interview").

65. During the interview, Cavuto discussed the purported Sofacy/APT28 attack uncovered by the Company.  During the interview, Defendant Grano made materially false or misleading statements and/or, adopted and/or failed to correct the materially false and or misleading statements represented during the course of the interview by Fox Business and Cavuto concerning the provenance of the attack.

66. Specifically, during the interview with Cavuto, the following was stated:

**Reporter (Cavuto):** We're gonna talk about being caught in the act, literally. ***Thanks to Cyber Security experts at a firm called root9b. We now know some very powerful Russian hackers, with ties to the Kremlin, were preparing to hit U.S. banks. They darn near did. Root9b's CEO Joe Grano and COO John Harbaugh, are here to tell us what they found and stopped.***

**Reporter:** Welcome Gentlemen. Good to have both of you. So Joe, what was this about? What did you see? What did you notice?

**Grano:** ***Well I'm aware of what they found,*** the technical side of it, I'll leave to John but I'm very proud of the team in that they in conduct with work with one of our clients they uncovered a prospective attack against the UAE and UA bank and several US banks and entities. So I couldn't be more proud of the team and this is exactly what we need as a nation. The average corporation takes 312 days to find out they've been attacked. With their technology and their approach, we got in front of this before it ever happened, so I'm very proud.

**Reporter:** Yeah, so John you are a former NSA Operations Deputy Director, you know of this kind of stuff inside and out. How close was this to happening? In other words, if you didn't catch this when you did, what would have happened and spell out the dangers.

**Harbaugh:**  Sure, so Neil, so really at the end of the day, it's very difficult to know how close we were, but what I would focus on is the fact that we were able to find

these indicators where there was some threat being prepositioned against several financial institutions, and we were able to get that information to those potential victims before there was an opportunity for something to happen, which could have been bad.

**Reporter:** You know Joe, this move, just this sort of need thing the whole Patriot Act saying it went too far, the intrusions went too far and oddly it's united a lot of Republicans and Democrats so the idea that there is such a thing that's compromising our basic freedoms for safety. What do you say to that? What are we in danger of?

**Grano:** Look, first of all this is a new frontier relative to hacking. ***You've got state sponsored organizations such as this one and it's a very serious threat to the United States.*** My response to most of these people who are concerned about the fences were putting up, it's not about sacrificing liberty for security. It's about security liberty and that's the way I look at this.

**Reporter:** John, are we in danger of something big happening still, this issue not withstanding?

**Harbaugh**: So outside of this, what's been reported in this activity?

**Reporter:** Yup.

**Harbaugh:** Yeah, I mean so there's always, there's always that chance in cyber right? I mean there's been lots of reporting. There are other senior Government Officials that have talked about the significant threats in Cyber Space. I think those are all a reality. Whether it's targeting against industrial control systems, financial sector, significant players in the market. I think all of those things are still a strong possibility.

**Reporter:** Gentlemen, thank you very much and thanks for stopping this.

67.    Furthermore, during the interview, Fox Business ran images on the screen touting that root9B had in fact thwarted an attack by Russia on U.S. financial institutions.  During the interview, Fox Business displayed the following:

27





68.    Defendant Grano knowingly and recklessly allowed these statements by Fox Business and Cavuto to be alive in the market made regarding the Company's purported uncovering of the Sofacy/APT28 attack.  By not correcting the falsity and/or misleadingness of

these statements, either during or after the conclusion of the May 14, 2015 Fox Business Interview, the Company, Defendant Grano adopted these statements and failed to correct these statements in furtherance of perpetrating the scheme against investors that began with the May 12, 2015 Press Release and the APT28 Report.

69.    The above bold-faced statements referenced in paragraph 66 were materially false and misleading because, as discussed in more detail in paragraph 78, there is no link between the threat identified by root9B and Sofacy/APT28. Instead, the threat is likely the result of unsophisticated Nigerian hackers that were first identified by a volunteer group in 2008.

70.    As a result of the Company's May 12, 2015 Press Release, the APT28 Report, and the May 14, 2015 Fox Business Interview, the Company's stock price reached its all-time trading high of  $2.15 (including under its operating name, Premier Alliance) on May 19, 2015 during intraday trading.

**May 15, 2015 – Form 10-Q**

71.    On May 15, 2015, the Company filed its Form 10-Q with the SEC for the fiscal quarter ended March 32, 2015 ("May 15, 2015 Form 10-Q").  The May 15, 2015 Form 10-Q was signed by Defendants Grano and Smith.

72.    The May 15, 2015 Form 10-Q stated:

In the latter half of 2014, the Company launched and announced the repositioning of the Company's business and adjustment to its strategy to focus on cybersecurity and regulatory risk mitigation. Effort on the strategic and structural changes to the Company continue. In support of this strategy, in February 2015, the Company acquired IPSA International, Inc. and expanded its capabilities related to regulatory risk mitigation. With this acquisition, we gain significant scale for the Company while increasing our cross sell ability for our cyber and regulatory risk solutions. The strategic change in focus was driven by several factors: 1) our expertise, capabilities and proprietary solutions in the cyber security sector, 2) the growing opportunity related to cyber security, regulation and risk as indicated above, and 3)

our overall ineffectiveness related to our targeted energy solutions. We believe the demand for cyber security expertise and solutions will grow substantially and that this will continue to cause change related to solutions and regulation. root9b, our cyber security segment is differentiated in four ways. First, we have attracted many of the country's most highly recognized subject matter experts, most of whom have served within the National Security Agency. ***Second, root9B has proprietary hardware and software designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers***. Third, root9B utilizes an advanced integrated strategy known as active adversarial pursuit that employs HUNT capabilities, in which cyber threats are identified before or during an attack rather than discovering the attack after it has taken place. We believe this approach represents a game changer in cyber defense. During 2015, we are building an Adversarial Pursuit Operations Center to expand our ability to deliver these services as well as continuing to develop our proprietary products. Fourth, root9B is known for its training curriculum and capabilities regarding cyber security. The ongoing trend regarding cyber security is also moving into the regulatory/compliance arena beyond what it has traditionally been. We see these trends being a good fit for our business model although we cannot assure that we can fully take advantage of the same. To date our revenues in cyber have been below expectations, however we expect higher revenue growth during the remainder of the year, of which there can be no assurance at this time.

May 15, 2015 Form 10-Q, at 30 (emphasis added).

73.     Attached to the May 15, 2015 Form 10-Q were SOX certifications signed by

Defendants Grano and Smith falsely attesting to the accuracy of the May 15, 2015 Form 10-Q.

74.     In their SOX certifications, Defendants Grano and Smith each certified:

1     I have reviewed this Quarterly report on Form 10-Q of root9B Technologies, Inc.;

**2     *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstance under which such statements were made, not misleading with respect to the period covered by this report*;**

3     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the period presented in this report.

4   I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5   I have disclosed, based on my most recent evaluation, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

75.     The above bold-faced statements referenced in paragraphs 72-74 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, which were known to the Company and Defendants Grano and Smith or recklessly disregarded by them. Specifically, the Company and Defendants Grano and Smith made false and/or misleading statements and/or failed to disclose that: (1) the Cyber Solution's hardware offering was not proprietary and did not differentiate the Cyber Solutions business segment, but rather was a product that root9B acted as a reseller; and (2) this hardware was not specifically "designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers".

## THE TRUTH REGARDING THE COMPANY'S MATERIAL FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ARE REVEALED TO THE MARKET

### May 20, 2015 – KrebsonSecurity.com Article

76.     On May 20, 2015, cybersecurity expert Brian Krebs published the article entitled "Security Firm Redefines APT: African Phishing Threat" on his website Krebsonsecurity.com ("Krebs Article").

77.     The article discusses root9B's Cyber Solutions division and the claims the Company made in its May 12, 2015 press release.   The Krebs Article particularly discussed that the Company had mischaracterized the type of threat that the Company purportedly uncovered as well as the Company's lack of evidence to claim that the threat's origins/link to Sofacy.

78.     Specifically, the Krebs Article stated:

root9B said it had unearthed plans by a Russian hacking gang known variously as

the Sofacy Group and APT28. APT is short for "advanced persistent threat," and it's a term much used among companies that sell cybersecurity services in response to breaches from state-funded adversaries in China and Russia that are bent on stealing trade secrets via extremely stealthy attacks . . .

*However, according to an analysis of the domains reportedly used by the criminals in the planned attack, perhaps root9B should clarify what it means by APT. Unless the company is holding back key details about their research, their definition of APT can more accurately be described as "African Phishing Threat."*

The report correctly identifies several key email addresses and physical addresses that the fraudsters used in common across all of the fake bank domains. *But root9B appears to have scant evidence connecting the individual(s) who registered those domains to the Sofacy APT gang. Indeed, a reading of their analysis suggests their sole connection is that some of the fake bank domains used a domain name server previously associated with Sofacy activity:carbon2u[dot]com (warning: malicious host that will likely set off antivirus alerts).*

*The problem with that linkage is although carbon2go[dot]com was in fact at one time associated with activity emanating from the Sofacy APT group, Sofacy is hardly the only bad actor using that dodgy name server. There is plenty of other badness unrelated to Sofacy that calls Carbon2go home for their DNS operations, including these clowns.*

*From what I can tell, the vast majority of the report documents activity stemming from Nigerian scammers who have been conducting run-of-the-mill bank phishing scams for almost a decade now and have left quite a trail.*

For example, most of the wordage in this report from root9B discusses fake domains registered to a handful of email addresses, including "adeweb2001@yahoo.com," adeweb2007@yahoo.com," and "rolexzad@yahoo.com".

Each of these emails have long been associated with phishing sites erected by apparent Nigerian scammers. They are tied to this Facebook profile for a Showunmi Oluwaseun, who lists his job as CEO of a rather fishy-sounding organization called Rolexzad Fishery Nig. Ltd.

The domain rolexad[dot]com was flagged as early as 2008 by aa419.org, a volunteer group that seeks to shut down phishing sites — particularly those emanating from Nigerian scammers (hence the reference to the Nigerian criminal code 419, which outlaws various confidence scams and frauds). That domain also references the above-mentioned email addresses. Here's another phishy bank

domain registered by this same scammer, dating all the way back to 2005!

***Bob Zito, a spokesperson for root9B, said "the team stands by the report as 100 percent accurate and it has been received very favorably by the proper authorities in Washington (and others in the cyber community, including other cyber firms)."***

I wanted to know if I was alone in finding fault with the root9B report, so I reached out to Jaime Blasco, vice president and chief scientist at AlienVault — one of the security firms that first published the initial findings on the Sofacy/APT28 group back in October 2014. ***Blasco called the root9B research "very poor" (full disclosure: AlienVault is one of several advertisers on this blog).***

***"Actually, there isn't a link between what root9B published and Sofacy activity," he said. "The only link is there was a DNS server that was used by a Sofacy domain and the banking stuff root9B published. It doesn't mean they are related by any means. I'm really surprised that it got a lot of media attention due to the poor research they did, and [their use] of [terms] like 'zeroday hashes' in the report really blew my mind. Apart from that it really looks like a 'marketing report/we want media coverage asap,' since days after that report they published their Q1 financial results and probably that increased the value of their penny stocks."***

(Emphasis added).

79.     On this news, shares of root9B fell $0.13 per share or over 5% over the next two days to close at $2.32 per share on May 21, 2015.

### June 15, 2015 – *SeekingAlpha* Article

80.     On June 15, 2015, *SeekingAlpha.com* published an article entitled "*ROOT9: -82.5% Downside On Management Fraud Allegations, Cyber Failure And Bankruptcy - Strong Sell,*" by an anonymous author named the Pump Stopper (the "*Seeking Alpha* Article").

81.     The *Seeking Alpha* Article is a longer article which discusses, among other things: (i) the history of certain people involved in root9B; (ii) the Company's lack of a proprietary cyber product; (iii) the source of the Company's Cyber Solutions operating segment's revenues; and the state of the Company's Cyber Solutions business segment's operations and its products being

34

materially overstated.

82.     In this article, the market first learned that the Company's Cyber Solutions business segment's revenue were substantially derived from a "one-time low margin" hardware installation that the Company had been representing as "proprietary" and ""designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers."

83.     Specifically, in relevant part, the *Seeking Alpha* Article stated:

Since RTNB's "cyber" product is so obviously a bad joke while the cyber community and RTNB's employees are publicly upset, I felt compelled to double check with the company in case I missed something, how can there be nothing of value at RTNB. I called Ken Smith, RTNB's CFO to get more perspective on the paltry $4.07 million in shrinking, unprofitable cyber revenue and the company's product claims.

*I was told a large portion of "cyber" was actually a one-time low margin hardware installation, projects RTNB will be apparently moving away from going forward so it seems we can expect even more cyber revenue declines.* Best I can tell, another component of revenue is largely what appears to me an old training and certification service for a product RTNB acts as a *reseller* for. During our conversation, RTNB's CFO Ken didn't even seem to know what the product was called! RTNB's investor presentation is also literally one of the worst presentations I've ever seen in my life, full of useless blathering about the "TAM" and listing global issues without discussing what RTNB actually does in any useful detail and ZERO discussion of any of RTNB's financials or investment aspects at all!

*Doing more work, despite CFO's apparent ignorance and vague company rambling, it appears to me RTNB's cyber claims are also based on a product called Digital Shield, a product RTNB resells, and installs for other companies and municipalities* with a price point of $3,600 - RTNB is going to have to do an impossible amount of reselling this old "training module" to justify the current market capitalization of $134 million!

In my view, the level of incompetence here even rivals that of The KEYW Holding Corporation (NASDAQ:KEYW), another company with incompetent management and a failing cyber product I previously exposed here. Similarly, it seems clear both KEYW and RTNB are likely to fail and wipe out their shareholders.

84.     On this news, this shares of root9B fell $0.17 per share, or over 9%, from the closing

price of $1.87 on Friday, June 12, 2015, to close at $1.70 per share on Monday, June 15, 2015, on extremely heavy volume of 1,488,000 shares. The average daily trading volume for root9B shares in the three months preceding June 15, 2015 was 177,619 shares. root9B's stock price continued to decline on heavy volume over the next week, closing at$1.02 on June 23, 2015 after heavy trading of 2,251,700 shares on that day.

85.     After the *Seeking Alpha* Article was published and as a result of the above disclosure in the *Seeking Alpha* Article, the Company discontinued stating in its public filings with the SEC that the Cyber Solution business segment was differentiated as a result of the Company's "proprietary hardware" that was "designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers" as it had been consistently stating throughout the Class Period.

86.     Furthermore, after the publication of the *Seeking Alpha* Article, the Company began to increase its disclosure concerning the Company's hardware installation and the revenues derived from it and its effect on the Cyber Solutions business segment's revenue.   The Company's disclosures regarding these subjects further substantiate the material falsity and/or misleadingness of the Company's statements and omissions as reflected below in paragraphs 87 to 92.

### *ADDITIONAL STATEMENTS AFTER THE CLASS PERIOD*

### <u>August 14, 2015 – Form 10-Q</u>

87.     On August 14, 2015, the Company filed its Form 10-Q with SEC reporting its financial results for the fiscal quarter ended June 30. 2015 ("August 14, 2015 Form 10-Q").  In the August 14, 2015 Form 10-Q, the Company disclosed in the following concerning its Cyber Solution business segment's revenues and its proprietary hardware:

Revenue for the CS segment for the quarter ended June 30, 2015 increased 13.1% as compared to the quarter ended June 30, 2014. ***The primary reason for the increase in revenue is due to an increase in revenue from cyber training and revenue from two new cyber services projects. Additionally, during the second quarter of 2014, the CS segment had revenue of approximately $224,000 from hardware re-sales which was not repeated in the second quarter of 2015. Revenue for this line of business (hardware re-sales) is significantly lower in 2015 as compared to 2014 and it is planned to be discontinued. The CS segment has operated as an early stage business to date and revenue growth has been pressured by a longer than expected sales cycle for its newly developed product offering.***

August 14, 2015 Form 10-Q, at 25.

88.     Furthermore, the August 14, 2015 Form 10-Q went on to state:

Revenue for the CS segment for the six months ended June 30, 2015 decreased 18.6% as compared to the six months ended June 30, 2014. ***The primary reason for the decline in revenue is due to revenue from hardware re-sales in the first six months of 2014, in the amount of approximately $614,000, which was not repeated during the first six months of 2015. Revenue for this line of business (hardware re-sales) is significantly lower in 2015 as compared to 2014 and it is planned to be discontinued.*** The other areas of revenue, training and operations, recorded an increase in revenue during the first six months of 2015 as compared to the first six months of 2014.

August 14, 2015 Form 10-Q, at 31.

89.     Additionally, the August 14, 2015 Form 10-Q stated:

The Company acquired root9B, its wholly owned cybersecurity business at the end of 2013. In 2014, root9B began expanding the number of subject matter experts it employs from 6 to its current number of 43, ***and developed and enhanced its offensive and defensive cyber operations platforms and tools. These efforts have resulted in the development of Orion an Active Adversarial Pursuit (HUNT) platform,*** Orkos which identifies compromised credentials and supports predictive remediation, Cerberus which provides host based security analytics and breach monitoring and Event Horizon which provides non attributable network access that allows users to connect to a secure managed tunnel for web, e-mail and file transfers. The Adversary Pursuit Center (APC), root9B's 24/7 manned cyber security center is scheduled to open in September 2015. The APC combines internal and external threat intelligence feeds to drive pursuit operations and perimeter defense within client networks. In 2014 we reported approximately $4.0 million in cybersecurity revenue which was broken down between $1.5 million of training,

$1.6 million of low margin hardware re-sales and $0.9 million of operations income. *We plan to discontinue the re-sale of hardware and focus on the development, sale and licensing of root9B's tools at significantly higher margins. We continue to believe that root9B's Orion Hunt Platform and other tools will provide a distinct advantage by allowing customers to focus on identifying potential threats before significant data breaches occur rather than remediation after the occurrence. We are still in the early stages of commercialization and while we believe that our business developments efforts will be successful, and enhanced by the opening of the APC in September 2015, there can be no assurances that our efforts to commercialize our new products offerings and grow root9B's revenues will be successful.*

August 14, 2015 Form 10-Q, at 38.

### November 13, 2015 – Form 10-Q

90.     On November 13, 2015, the Company filed its Form 10-Q with SEC reporting its financial results for the fiscal quarter ended September 30, 2015 ("November 13, 2015 Form 10-Q"). In the November 13, 2015 Form 10-Q, the Company disclosed in the following concerning its Cyber Solution business segment's revenues and its proprietary hardware:

Revenue for the CS segment for the quarter ended September 30, 2015 decreased 40.4% as compared to the quarter ended September 30, 2014. *The primary reason for the decrease in revenue is related to hardware re-sales. During the third quarter of 2014, the CS segment had revenue of approximately $940,000 from hardware re-sales which was not repeated in the third quarter of 2015. Revenue for this line of business (hardware re-sales) is significantly lower in 2015 as compared to 2014 and it is being discontinued. The CS segment has operated as an early stage business. We believe that the Company's products and service offerings represent a disruptive technology and our efforts have been focused on gaining acceptance in the marketplace. While we continue to believe that our products and service offerings provide unique and significant benefits over the existing products in the marketplace, no assurance can be given as to if and when our products will receive broad acceptance in the marketplace.*

November 13, 2015 Form 10-Q, at 26.

91.     Furthermore, the November 13, 2015 Form 10-Q went on to state:

*Revenue for the CS segment for the nine months ended September 30, 2015 decreased 30.3% as compared to the nine months ended September 30, 2014. The*

*primary reason for the decline in revenue is due to revenue from hardware re-sales in the first nine months of 2014, in the amount of approximately $1,550,000, which was not repeated during the first nine months of 2015. Revenue for this line of business (hardware re-sales) is significantly lower in 2015 as compared to 2014 and it is being discontinued. The CS segment has operated as an early stage business. We believe that the Company's products and service offerings represent a disruptive technology and our efforts have been focused on gaining acceptance in the marketplace. While we continue to believe that our products and service offerings provide unique and significant benefits over the existing products, no assurance can be given as to if and when our products will receive broad acceptance in the marketplace.*

November 13, 2015 Form 10-Q, at 32.

92.     Additionally, the November 13, 2015 Form 10-Q disclosed:

The Company acquired root9B, its wholly owned cybersecurity business at the end of 2013. ***In 2014, root9B began expanding the number of subject matter experts it employs from 6 to its current number of 48***, and developed and enhanced its offensive and defensive cyber operations platforms and tools**.** These efforts have resulted in the development of Orion an Active Adversarial Pursuit (HUNT) platform, Orkos which identifies compromised credentials and supports predictive remediation, Cerberus which provides host based security analytics and breach monitoring and Event Horizon which provides non attributable network access that allows users to connect to a secure managed tunnel for web, e-mail and file transfers. The Adversary Pursuit Center (APC), root9B's 24/7 manned cyber security center opened in September 2015. The APC combines internal and external threat intelligence feeds to drive pursuit operations and perimeter defense within client networks. ***In 2014, we reported approximately $4.0 million in cybersecurity revenue which was broken down between $1.5 million of training, $1.6 million of low margin hardware re-sales and $0.9 million of operations income***. *We plan to discontinue the re-sale of hardware and focus on the development, sale and licensing of root9B's tools at significantly higher margins. We continue to believe that root9B's Orion Hunt Platform and other tools will provide a distinct advantage by allowing customers to focus on identifying potential threats before significant data breaches occur rather than remediation after the occurrence. We are still in the early stages of commercialization and while we believe that our business developments efforts will be successful, and enhanced by the opening of the APC in September 2015, there can be no assurances that our efforts to commercialize our new products offerings and grow root9B's revenues will be successful.*

November 13, 2015 Form 10-Q, at 39.

93.     The bold-faced statements in paragraphs 87-92 are admissions by the Company which support the falsity and/or misleadingness of the statements and/or the Defendants' omissions in paragraphs 34, 38-40, 44-46, and 72-74 as the Company during the Class Period: (i) did not possess "proprietary hardware"; (ii) the purported "proprietary hardware" did not differentiate root9B from its competitors as it was merely a product it was reselling; and (iii) hardware sales by the Cyber Solutions segment were based on one-time low-margin installations that did not provide an ongoing revenue stream.

**THE DEFENDANTS INTENTIONALLY OR RECKLESSLY MISLED INVESTORS**

94.     The materially false and misleading statements and omissions discussed above were made by the Defendants either intentionally and/or with reckless disregard to accuracy.  The Defendants' scienter stems from: (i) the Company's real liquidity and revenue issues and the Defendants' efforts to protect millions of dollars of shares and options owned by them and the Company's insiders, including those shares received as a result of the Company acquiring various entities owned by Grano and other insiders; (ii) protecting their own lucrative personal salaries; and (iii) the motive to profit from the sales of root9B stock at artificially inflated prices, especially in light of the real risks and issues was facing financially and operationally. Scienter is further supported by the strategic importance of the Cyber Solutions segment to the Company as well as Defendant Smith's unexpected resignation from the Company.

95.     Accordingly, Defendants intentionally or recklessly set forth a scheme to substantiate the legitimacy and effectiveness of the Company's Cyber Solutions business segment's offerings to potential clients and investors while also intentionally or recklessly artificially inflating the Company's stock price.  Throughout the Class Period, the Company was

suffering from severe liquidity issues and was reliant upon investors to fund its operations. Given

the reliance on investors to support the Company, Defendant's made material misrepresentations

and omissions concerning the Cyber Solutions business segment's offerings and revenues, in order

to achieve financing and keep the Company afloat.

96.     Additionally, Defendants timed the publication of the materially false and

misleading statements regarding the purportedly planned cyberattack by Sofacy/APT 28 to occur

shortly after the effectiveness of a registration statement that registered 9,879,804 million shares

of unregistered stock owned by Company insiders as to artificially increase the Company's stock

price. By artificially increasing the Company's stock price, these selling shareholders, including

Defendants, Company insiders, and others with ties to Defendants, would be able to sell their

shares at artificially inflated prices.

97.     Thus, individually and collectively, these facts give rise to a strong inference of

scienter.

### *The Company was Suffering Significant Cash Flow Deficits; Had Severe Liquidity Issues; and Was Totally Dependent Upon Financing to Stay Afloat*

98.     Throughout the Class Period, the Company was experiencing significant financial

pressures as the Company failed to produce sufficient operating cash flows to cover the day-to-

day expenses of the Company. As such, the Company was dependent upon financing in order fund

its operations.

99.     At the beginning of the Class Period the Company was experiencing significant

reductions of revenues, primarily through the failing Energy Solutions business segment, and an

increase in expenses related to the rebranding of the Company and investments into the Cyber

Solutions business segment. The Company's Cyber Solution segment's revenues were further

affected during the Class Period from lengthy sales cycles and long proof of concept requests from its potential Cyber Solutions business segments customers.

100.    In the Company's November 14, 2014 Form 10-Q, the Company made the following relevant statements:

### Note 12 – Liquidity and Capital Resources:

*As of September 30, 2014, the Company had cash and cash equivalents of approximately $966,000, compared to approximately $7,004,000 at December 31, 2013, a decrease of $6,038,000.* The decrease is primarily attributable to the net use of cash in operations for the nine months ended September 30, 2014 of $3,476,000 and reduction of the outstanding balance on the line of credit in the amount of $2,721,000. The Company decided not to renew the line of credit when it came due in July 2014 and paid off the outstanding balance on July 3, 2014. The Company had a cash balance of approximately $2,005,000 as of November 1, 2014, including the net proceeds of the private placement described in Note 11.

*The Company's revenues were down during the first nine months of 2014, compared to revenues for the same period a year ago, by $5,814,000, or 28.2%. The primary cause of the reduction in revenues was a significant reduction in activity experienced in the Company's Energy Services segment. The Company has evaluated all lines of business both from a historical performance perspective* as well as looking at opportunities for future growth.  As a result of this evaluation, the Company has *launched the repositioning of the Company and adjustment of the Company's strategy.  The repositioning effort is underway and includes a change of the business to focus on cyber security and regulatory risk mitigation, renaming the Company "root9B Technologies, Inc.", and de-emphasizing the Energy Solutions segment by adjusting its focus to operate in support of the Cyber Solutions and Business Advisory Solutions segments.*  In addition, the Company's SG&A expenses have increased at a rate higher than revenue growth as they invest in infrastructure and support for future growth. *The consequence of the downturn in the Company's revenues and increase in expenses is significant liquidity pressures.*

*The Company is taking steps to try to improve its liquidity going forward by executing on a repositioning of the Company and strategy adjustment, focusing on the areas of the business with the most opportunity for revenue growth and continuing to manage costs.* Additionally, the Company is exploring various financing alternatives to provide additional liquidity. As indicated in Note 11, the Company recently closed on $1,250,000 of additional financing, which provides some relief for near term liquidity pressures. However, if these steps are not

successful in the near term, the Company will need to seek additional financing, in addition to the financing referred to in Note 11. ***The Company will need significant additional financing to carry out the repositioning plan and assure future operation and there can be no assurance that we will be able to obtain the same, or if obtained, on terms favorable to the Company.***

November 14, 2014 Form 10-Q, at 16 (emphasis added).

101.    Later in the November 14, 2014 Form 10-Q the Company provided additional

details as to their cash flow objectives.  The following relevant information was stated:

**Liquidity and Capital Resources**

*As of September 30, 2014, the Company had cash and cash equivalents of approximately $966,000, compared to approximately $7,004,000 at December 31, 2013, a decrease of $6,038,000. The decrease is primarily attributable to the net use of cash in operations for the nine months ended September 30, 2014 of $3,476,000 and reduction of the outstanding balance on the line of credit in the amount of $2,721,000.* The Company decided not to renew the line of credit when it came due in July 2014 and paid off the outstanding balance on July 3, 2014.

*Overall, our revenues were down during the first nine months of 2014, compared to revenues for the same period a year ago, by $5,814,000, or 28.2%. The primary cause of this reduction in our revenues was a significant reduction in activity experienced in our Energy Services segment.* We have evaluated all of our lines of business both from a historical performance perspective as well as looking at opportunities for future growth. As a result of this evaluation we have launched the repositioning of the Company and adjustment of the Company's strategy. *The repositioning effort is underway and includes a change of the business to focus on cyber security and regulatory risk mitigation, renaming the Company "root9B Technologies, Inc.", and de-emphasizing the Energy Solutions segment by adjusting its focus to operate in support of the Cyber Solutions and Business Advisory Solutions segments. In addition our SG&A expenses have increased at a rate higher than revenue growth as we invest in infrastructure and support for future growth.*

*The consequence of the downturn in our revenues and increase in our expenses is significant liquidity pressures.*

*Our objective from a liquidity perspective is to use operating cash flows to fund day to day operations. In both the first nine months of 2014 and 2013 we did not achieve this objective, as cash flow from operations in the first nine months of 2014 and 2013 was a net use of $3.5 million and $2.3 million,*

43

*respectively.  **The Company is taking steps to try to improve its liquidity going forward by executing on the repositioning and strategy adjustment, focusing on the areas of the business with the most opportunity for revenue growth and continuing to manage costs**. Additionally, we are exploring various financing alternatives to provide additional liquidity. We recently closed on $1,250,000 of additional financing, which provides some relief for near term liquidity pressures.  We will need significant additional financing to carry out our repositioning plan and assure future operations and there can be no assurance that  we will be able to obtain the same, or if obtained, on terms favorable to the Company.*

*Working capital was $(814,000) and $4,177,000, at September 30, 2014 and December 31, 2013, respectively, a decrease of $4,991,000. The  decrease results primarily from the decrease in cash from operations of $3,476,000. The recent closing of additional financing in the amount of $1,250,000  has provided additional liquidity and improved our weak working capital position at September 30, 2014.*

*Non-current liabilities at September 30, 2014 are $4,327,000, and primarily consist of a derivative liability related to the current valuation of all outstanding common stock purchase warrants, of $4,237,000, which is a non-cash liability. Stockholders' Equity was $1,739,000 at September 30, 2014 (representing 14.1% of total assets), compared to a balance at December 31, 2013 of $16,922,000 (representing 68.9% of total assets).*

*Line of Credit*
*The Company closed on a new asset based revolving line of credit on July 5, 2013 with a financial institution, increasing the borrowing base to 80%   of eligible receivables or $3,000,000. In accordance with this new facility, the Company was required to maintain a compensating balance of $3 million on account at this financial institution.  However, the loan terms did include a release provision on the compensating balance, reducing it as the Company met net operating income thresholds set forth in the loan agreement. As the line of credit required a compensating balance for  the  full amount of  the  line, effectively           providing              the             Company             with when it came due in July 2014 and paid off the outstanding balance on July 3, 2014.*

November 14, 2014 Form 10-Q, at 29-30 (emphasis added).

102.    Furthermore, the November 14, 2014 10-Q highlighted the reduction one of the

Company's three business segments, Energy Solutions, stating that "[r]evenue for the ES segment for the quarter ended September 30, 2014 decreased 90.1% as compared to the quarter ended September 30, 2013." November 14, 2014 Form 10-Q, at 20.

103.    As clearly reflected here at the beginning of the Class Period, the Company was already experiencing significant cash flow issues, was facing significant liquidity issues, and was dependent upon financing to continue its operations.

104.    As such, Defendants were motivated to make materially false and/or misleading statements or omitted to state material information in order to lure investors into financing the Company while Defendants attempted to build a new source of revenue from the Cyber Solutions business segment.

105.    By the end of the next fiscal quarter, ended December 31, 2014, the Company's financial situation and continued reliance on investors to fund operations failed to improve significantly.

106.    These risk were highlighted by the Company through its numerous risk warnings to investors in the Company's 2014 Form 10-K.  These risk warnings, in relevant part stated:

*Risks Related to Our Business and Industry*

**WE HAVE CONTINUED TO EXPERIENCE SIGNIFICANT LOSSES FROM OPERATIONS**

*We have experienced substantial and continuing losses from operations. These are the result of declining revenues and increases in selling, general and administrative expenses incurred in preparation for growth. We expect that our cyber security operations and the operations of IPSA, which we acquired in February 2015, will increase revenues and help move the Company to profitability from operations, of which there can be no assurance.*

2014 Form 10-K, at 5 (emphasis added).

\*       \*       \*

**OUR LENGTHY SALES CYCLE COULD MAKE IT MORE DIFFICULT TO ACHIEVE OUR GROWTH OBJECTIVES.**

***The period between initial contact with a potential customer and that customer's purchase of services is often long.*** A customer's decision to purchase services involves a significant allocation of resources on our part, is influenced by a customer's budgetary cycles, and in many instances involves a preferred vendor process. To successfully sell our services, generally we must educate the potential customers regarding the uses and benefits of our services, which can require significant time and resource***s. Many potential customers are large enterprises that generally take longer to designate preferred vendors; the typical sales cycle in connection with becoming an approved vendor has been approximately six to 12 months.*** Delay or failure to complete sales in a particular quarter could reduce revenues in that quarter, as well as subsequent quarters over which revenues for the sale would likely be recognized. If the sales cycle unexpectedly lengthens in general, or for one or more large orders, it would adversely affect the timing of revenues and revenue growth. If we were to experience a delay of several weeks on a large order, it could harm our ability to meet forecasts for a given quarter.

2014 Form 10-K, at 6 (emphasis added).

\*       \*       \*

**OUR SALES CYCLES CAN BE LONG AND UNPREDICTABLE, AND OUR SALES EFFORTS REQUIRE CONSIDERABLE TIME AND EXPENSE. AS A RESULT, OUR SALES AND REVENUE ARE DIFFICULT TO PREDICT AND MAY VARY SUBSTANTIALLY FROM PERIOD TO PERIOD, WHICH MAY CAUSE OUR RESULTS OF OPERATIONS TO FLUCTUATE SIGNIFICANTLY.**

Our results of operations may fluctuate, in part, because of the resource intensive nature of our sales efforts, the length and variability of our sales cycle and the short-term difficulty in adjusting our operating expenses. Our results of operations depend in part on sales to large organizations. ***The length of our sales cycle, from proof of concept to delivery of and payment for our products, is typically four to twelve months but can be more than a year. To the extent our competitors develop products that our prospective customers view as equivalent to ours, our average sales cycle may increase.*** Because the length of time required to close a sale varies substantially from customer to customer, it is difficult to predict exactly when, or even if, we will make a sale with a potential customer. As a result, large individual sales have, in some cases, occurred in quarters subsequent to those we anticipated, or have not occurred at all. The loss or delay of one or more large transactions in a

quarter could impact our results of operations for that quarter and any future quarters for which revenue from that transaction is delayed.

2014 Form 10-K, at 7 (emphasis added).

*        *        *

**IF WE ARE UNABLE TO SELL OUR PROPRIETARY PRODUCTS, SUBSCRIPTIONS AND SERVICES, AS WELL AS RENEWALS OF OUR SUBSCRIPTIONS AND SERVICES, TO OUR CUSTOMERS, OUR FUTURE REVENUE AND OPERATING RESULTS WILL BE HARMED.**

***Our future success depends, in part, on our ability to expand the deployment of our products with new and existing customers, including solutions delivered through the new Adversarial Pursuit Center,.*** This may require increasingly sophisticated and costly sales efforts and may not result in additional sales. In addition, the rate at which our customers purchase additional products, subscriptions and services depends on a number of factors, including the perceived need for additional IT security as well as general economic conditions. If our efforts to sell additional products, subscriptions and services to our customers are not successful, our business would suffer.

Further, existing customers that purchase our products have no contractual obligation to renew their subscriptions and support and maintenance services beyond the initial contract period, and given our limited operating history, we may not be able to accurately predict our renewal rates. Our customers' renewal rates may decline or fluctuate as a result of a number of factors, including the level of their satisfaction with our products, our customer support, customer budgets and the pricing of our products compared with the products and services offered by our competitors. We cannot assure that our customers will renew their subscriptions, and if our customers do not renew their subscriptions or renew on less favorable terms, our revenue may grow more slowly than expected, if at all.

We also depend on our installed customer base for future support and maintenance revenue. We offer our support and maintenance agreements for terms that generally range between one and five years. If customers choose not to renew their support and maintenance agreements or seek to renegotiate the terms of their support and maintenance agreements prior to renewing such agreements, our revenue may decline.

**IF WE ARE UNABLE TO INCREASE SALES OF OUR SOLUTIONS TO LARGE ORGANIZATIONS WHILE MITIGATING THE RISKS ASSOCIATED WITH SERVING SUCH CUSTOMERS, OUR BUSINESS, FINANCIAL POSITION AND RESULTS OF OPERATIONS MAY**

**SUFFER.**

Our growth strategy is dependent, in part, upon increasing sales of our solution to large enterprises and governments. Sales to large customers involve risks that may not be present (or that are present to a lesser extent) with sales to smaller entities. These risks include:

·        Increased purchasing power and leverage held by large customers in negotiating contractual arrangements with us;

·        More stringent or costly requirements imposed upon us in our support service contracts with such customers;

·        More complicated implementation processes;

·        Longer sales cycles and the associated risk that substantial time and resources may be spent on a potential customer that ultimately does not purchase our platform or solutions

·        More pressure for discounts and write-offs

In addition, because security breaches with respect to larger, high-profile enterprises are likely to be heavily publicized, there is increased reputational risk associated with serving such customers. If we are unable to increase sales of our platform to large enterprise and government customers while mitigating the risks associated with serving such customers, our business, financial position and results of operations may suffer.

2014 Form 10-K, at 8 (emphasis added).

107.    Discussing the Company's financial condition and liquidity, the 2014 Form 10-K,

in relevant part stated:

*Financial Condition and Liquidity*

***As of December 31, 2014, we had cash and cash equivalents of $765,000, compared to $7,004,000 at December 31, 2013, a decrease of $6,239,000.*** The decrease is primarily attributable to the net use of cash in operations for the year ended December 31, 2014 of $5,534,000 and reduction of the outstanding balance on the line of credit in the amount of $2,721,000, which were offset by the proceeds of $1,800,000 from the issuance of the 10% convertible notes. The Company decided not to renew the line of credit when it came due in July 2014 and paid off the outstanding balance on July 3, 2014. ***After financings in the first quarter of 2015 (see below), our cash position has increased and outstanding cash and cash equivalents at March 16, 2015 was approximately $6.2 million. Overall, our revenues were down during 2014, compared to revenues for the same period a year ago, by $6,224,000, or 23.5%. The primary cause of this reduction in our revenues was a significant reduction in activity experienced in our Energy***

48

*Services segment, and a reduction in revenues of our Business Advisory Solutions group also contributed to a decrease in overall revenues. We have evaluated all of our lines of business both from a historical performance perspective as well as looking at opportunities for future growth. As a result of this evaluation we have launched the repositioning of the Company and adjustment of the Company's strategy. The repositioning effort included a change of the business to focus on cyber security and regulatory risk mitigation, renaming the Company "root9B Technologies, Inc.", and de-emphasizing the Energy Solutions segment by adjusting its focus to operate in support of the Cyber Solutions and Business Advisory Solutions segments.* In addition, our SG&A expenses have substantially increased although our revenues have been declining, as we invest in infrastructure and support for future growth.

*The consequence of the downturn in our revenues and increase in our expenses is significant liquidity pressures.*

*The goal of the Company from a liquidity perspective is to use operating cash flows to fund day to day operations. In both 2014 and 2013, we have not met this goal as cash flow from operations has been a net use of $5.5 million and $3.2 million, respectively.* The Company is taking steps to try to improve its liquidity going forward by executing on its repositioning and strategy adjustment, focusing on the areas of the business with the most opportunity for revenue growth and continuing to manage costs. In addition, the Company expects the acquisition of IPSA International will enhance operations, of which there can be no assurance. *Additionally, we continue to explore various financing alternatives to provide additional liquidity. In February and March of 2015, we closed on approximately $7,400,000 and $4,000,000, respectively, of additional financing, which proceeds were partially used for the acquisition of IPSA International and will also provide relief for near term liquidity pressures. We will need significant additional financing to carry out our repositioning plan and assure future operations and there can be no assurance that we will be able to obtain the same, or if obtained, on terms favorable to the Company.*

*Working capital was $(1,607,000) and $4,177,000, at December 31, 2014 and 2013, respectively, a decrease of $5,784,000. The decrease results primarily from the decrease in cash from operations of $5,534,000. The recent closing of additional financing in the amount of $11,400,000 has provided additional liquidity and improved our working capital position from that at December 31, 2014.*

Non-current liabilities at December 31, 2014 are $10,740,000, and primarily consist of a derivative liability related to the current valuation of outstanding common stock purchase warrants, of $10,651,000, which is a non-cash liability. Stockholders' Equity (Deficit) was $(5,548,000) at December 31, 2014, compared

to a balance at December 31, 2013 of $16,922,000 (representing 68.9% of total assets).

2014 Form 10K, at 28-29 (emphasis added).

108.    The 2014 Form 10-K went on further to state concerning the Company's financial position, and specifically notes that the Company's common stock trading price "could make it more difficult to obtain financing through the issuance of equity or debt securities."  In relevant part, the 2014 Form 10-K states:

> *We are actively exploring additional sources of financing as we expect we will need to raise additional funds in order to fund operations. Without substantial additional financing, the Company will not be able to continue operating in the manner that is presently in place, and would have to reduce operations and/or restructure selling, general and administrative expenses. A financing for approximately $11,400,000 of net proceeds has been completed subsequent to December 31, 2014* and those proceeds were partially used to fund the acquisition of IPSA International, Inc. *as well as to relieve short term liquidity pressures.*
>
> Financing transactions may include the issuance of equity or debt securities, and obtaining credit facilities, or other financing mechanisms. ***The trading price of our common stock, or if the Company continues to incur losses could make it more difficult to obtain financing through the issuance of equity or debt securities.*** If we issue additional equity or debt securities, stockholders will likely experience additional dilution or the new equity securities may have rights, preferences or privileges senior to those of existing holders of our common stock.

2014 Form 10K, at 30 (emphasis added).

109.    The Company continued to be reliant upon investors to continue operations as the Company's operating cash flows at the end of the first fiscal quarter 2015, for the period ended March 31, 2015.  In relevant part, the May 15, 2015 Form 10-Q stated:

> **Note 12 – Liquidity and Capital Resources:**
>
> *As of March 31, 2015, we had cash and cash equivalents of $5,054,433, compared to $765,099 at December 31, 2014, an increase of $4,289,334. The increase is primarily attributable to the proceeds from the three equity financing transactions during the first quarter of 2015 which totaled approximately*

*$11,300,000, offset by the net cash used in operations of approximately $6,880,000. The Company had a cash balance of approximately $4.2 million as of May 8, 2015.*

*Our objective from a liquidity perspective is to use operating cash flows to fund day to day operations. In both the first quarter of 2015 and 2014 we did not achieve this objective, as cash flow from operations in the first quarter of 2015 and 2014 has been the net use of $6.9 million and $2.2 million, respectively. Our high use of cash has been predominantly caused by a slower than expected pace of revenue growth in our existing businesses, costs associated with the IPSA acquisition and costs associated with the integration of the recent acquisition.* The Company continues to take steps to improve its liquidity going forward by executing on its repositioning and strategy adjustment that was announced in 2014, fully integrating IPSA, focusing on the areas of the business with the most opportunity for revenue growth and continuing to manage costs. *We expect our cyber unit's performance generate positive cash flow over the remainder of the year. If this does not occur we may have to obtain additional financing to support our future operations and there can be no assurance that we will be able to obtain such financing, or if obtained, on terms favorable to the Company. Failure to obtain the same will adversely affect the operations of the Company.*

May 15, 2015, Form 10-Q, at 20 (emphasis added).

110.    Furthermore, the Company's liquidity issues continued through the second fiscal quarter of 2015.  As stated in the Company's August 14, 2015 Form 10-Q reporting root9B's financial results for the fiscal quarter ended June 30, 2015, the Company was still suffering from negative cash flow and would need to acquire additional financing before the end of the third fiscal quarter 2015 to continue operations.  Specifically, the August 14, 2015 Form 10-Q stated:

*Because of the time needed to build root9B and IPSA revenues, and the selling, general and administrative expenses of the Company related to such anticipated growth, the Company has been experiencing negative cash flow and has used periodic financings to maintain its operations. If the Company's expectations about revenue growth are achieved, of which there can be no assurance, it will achieve positive cash flow by the end of 2015. However, the Company will require additional financing before the end of the third quarter of 2015 to sustain operations. The Company is currently pursuing available options for obtaining the required financing. However, no assurances can be given that the Company will be successful in obtaining the necessary financing.*

51

August 14, 2015 Form 10-Q, at 38 (emphasis added).

111.    The Company's negative cash flow, its continued liquidity issues, and the Company's focus on the Cyber Solutions division to drive growth in the Company revenues, and the disclosed issues concerning the long sales cycles and the long proof of concepts required by potential clients before contracting, gives rise to a strong inference of scienter that Defendants made such materially false and/or misleading representations and/or omissions in order to bolster the Company's ability to procure investments to fund operations and increase the speed to which sales of the Cyber Solutions business segment's products could closed based upon implied credibility and effectiveness of the Company's Cyber Solutions products as a result of the May 12, 2015 Press Release, the APT28 Report, the May 14, 2015 Fox Business Interview, and the additional publicity provided by other media outlets reporting on the information contained in these publications.

112.    As a result of Defendants' materially false and/or misleading representations and/or omissions root9b successfully raised millions of dollars in the first quarter of 2015.

113.    On February 9, 2015, the Company entered into a securities purchase agreement with an accredited investor, pursuant to which the Company issued 5,586,450 shares of common stock at a purchase price of $1.10 per share. In addition, the Company issued warrants to purchase up to 5,135,018 shares of the Company's common stock in the aggregate, at an exercise price of $0.80 per share. Upon closing of this equity financing, the Company received proceeds of $6,145,095.

114.    On February 17, 2015, the Company entered into a securities purchase agreement with an accredited investor, pursuant to which the Company issued 1,162,321 shares of common

stock at a purchase price of $1.10 per share. In addition, the Company issued warrants to purchase up to 1,068,390 shares of the Corporation's common stock in the aggregate, at an exercise price of $0.80 per share.  Upon closing of this equity financing, the Company received proceeds of $1,278,553.

115.    On March 12, 2015, the Company entered into securities purchase agreements with a group of accredited investors, pursuant to which the Company issued 3,686,818 shares of common stock at a purchase price of $1.10 per share. In addition, the Company issued warrants to purchase up to 1,843,413 shares of the Corporation's common stock in the aggregate, at an exercise price of $1.50 per share.  Upon closing of this equity financing, the Company received proceeds of $4,055,498.

***Defendants Grano and Smith and Other of the Company's Insiders Had Significant Financial Interests at Stake if the Company Failed to Continue Operations***

116.    The Individual Defendants were motivated to make the materially false and/or misleading statements and/or omitted to make additional disclosures in order to make their statements not materially false and/or misleading to protect their substantial shareholdings, options, and their lucrative salaries.

117.    Beyond the Individual Defendant's listed below, this was also to protect the ownership of all the executive officers and directors which collectively control approximately 23.5% of our current outstanding capital stock and approximately 27.0% on a fully diluted basis as stated in the 2014 Form 10-K.

(i)      Defendant Grano

118.    On May 20, 2014, the Company entered into an employment agreement with Grano for a term of three years. Pursuant to the terms of the employment agreement, the Company has

agreed to pay Grano a base salary of $500,000 annually.  Pursuant to his employment agreement, Grano shall also be eligible for a minimum guaranteed annual bonus of $500,000 and was issued an option to purchase an aggregate of 2,000,000 shares of the Company's Common Stock, which will vest one third immediately, one-third after one year and one-third after two years.  As of April 10, 2015, Grano beneficially owned 7,368,833 shares or 9.7% of the Company's issued and outstanding common stock.

119.    Grano's beneficial ownership reflects substantial amounts of shares owned by entities Grano is an owner and/or controls as a result of Premier Alliance acquiring various entities in which Grano had control and/or substantial ownership.  Of the 7,368,833 beneficially owned shares owned by Grano as of April 10, 2015:

(a)    500,000 shares were received in the acquisition of Ecological, LLC by the Company and are registered in the name of Centurion Holdings, LLC, of which Mr. Grano is a controlling member;

(b)    457,220 were received in the acquisition of IPSA International by the Company and are registered in the name of Centurion Holdings, LLC, of which Mr. Grano is a controlling member; and

(c)    2,681,613 shares were received in the acquisition of Ecological, LLC by the Company are are registered in the name of "Joseph C. Grano and Robert H. Silver, Trustees of The Grano Children's Trust dtd. December 13, 2012," and beneficially owned per a swap agreement in the Trust.

120.    Furthermore, 1,300,000 shares of common stock are issuable upon exercise of stock options issued to Joseph Grano, Jr, Chairman of the Board of Directors of the Company which are

held in the name of Centurion Holdings LLC, of which Mr. Grano is a controlling member.

121.    Additionally, Grano beneficially owned:

(a)      75,000 options issued for annual Board or Director Service in July 2013;

(b)      250,000 options issued for Board or Director service in March 2014; and

(c)      2,000,000 options issued when he was named the CEO in May 2014.

122.    As explained above, the ability of root9B to remain a going concern depended on Grano's ability to portray the Cyber Solutions Business segment in the most positive light possible so as to be able to secure financing for operations.  Without financing, root9B would not be able to survive and, by closing its doors, would put Grano out of work and destroy vast amounts of assets for him personally and those entities in which he has an ownership stake or is for the benefit of his family members.  Given these ownership stakes along with Grano's salary and outstanding stock options, he was highly motivated to keep root9B open and its stock price as high as possible.  Thus, Grano's beneficial ownership in the Company and his compensation from root9B was material and, in part, motivated him to perpetuate the fraudulent misrepresentations and omissions at issue herein.

(ii)     Defendant Smith

123.    On January 1, 2014 the Company entered into a one-year employment agreement with Smith. The employment agreement provided for $180,000 annual base salary. Mr. Smith also received an option to purchase an aggregate of 350,000 shares of common stock which will vest over a four year period.  As of April 10, 2015, Defendant Smith beneficially owned 450,000 shares of common stock issuable upon exercise of stock option issued in January 2014 upon him becoming the CFO and in March 2015. As of April 10, 2015, Smith's beneficial ownership equaled

0.6% of the Company's outstanding shares.   On November 11, 2015, Smith unexpectedly submitted his resignation as CFO of root9B effective November 20, 2015.

124.    Additionally, as explained above, the ability of root9B to remain a going concern depended on root9B's ability to portray the Company's Cyber Solutions segment in the most positive light possible so as to be able to secure financing for operations.   Without financing, root9B would not be able to survive and, by closing its doors, would put Smith out of work and destroy the value of the shares he received as part of the acquisition of root9B LLC by Premier Alliance.   Given Smith's salary, outstanding stock options, and ownership stake in the Company he was highly motivated to keep root9B open and its stock price as high as possible.   Smith's salary and ownership stake was material and, in part, motivated him to perpetuate the fraudulent misrepresentations and omissions at issue herein.

***Defendants Timed the Disclosure of the May 12, 2015 Press Release and APT28 to Pump the Company's Stock Price After the Registration of the Selling Stockholders Shares and to Offset the Negative Aspects of the Company's First Fiscal Quarter of 2015***

125.    As a result of the liquidity issues, stemming in material part from the Company's revenues, Defendants stood to lose millions of dollars if the Company went into bankruptcy.   As such, the Defendants undertook a scheme to substantiate its Cyber Solutions business segments products, while also hiding the true state of the Company's Cyber Solutions business segments offerings.   This scheme was perpetrated also to artificially inflate the Company's stock price to allow Defendants, insiders, and those who invested in the Company through unregistered shares the opportunity to sell at an inflated price in the event that the rebranding and new focus on cyber security proved unsuccessful, as in the case of the Energy Solutions.   However, before these selling shareholders, who shares were registered less than two weeks before the May 12, 2015 Press

Release and the APT28 Report was published, the Krebs Article removed significant portions of the artificial price inflation.

### December 23, 2013 – Form S-1 and May 1, 2015 Prospectus

126.    On or about December 23, 2013, the Company filed a Form S-1 ("December 23, 2013 Form S-1") seeking the registration of 10,247,994 shares of the Company's stock.

127.    On April 24, 2015, the second post-effective amendment to the December 23, 2013 Registration Statement ("April 24, 2015 Registration Statement Amendment").  The SEC later declared the April 24, 2014 Registration Statement Amendment effective on April 30, 2015. Thereafter on May 1, 2015, the Company filed its final prospectus on a Form 424B3 ("May 1, 2015 Prospectus").  Pursuant to the April 24, 2015 Registration Statement Amendment the number of shares registered was to 9,879,804.

128.    The May 1, 2015 Prospectus set forth in the Use of Proceeds section that:

> The shares of our common stock offered by this prospectus *are being registered solely for the account of the Selling Stockholders. We will not receive any of the proceeds from the sale of these shares*. However, if all of the Warrants offered in this prospectus were exercised, we would receive proceeds of $1,515,800 in the aggregate, which we would use for additional working capital.

(Emphasis added).

129.    The May 1, 2015 Prospectus  went on further to state that these "Selling Stockholders" (as defined below) were selling stock they acquired as a result of following:

> The "Selling Stockholders" named in this prospectus are offering to sell up to an aggregate of 9,879,804 shares of root9B Technologies Inc.'s common stock as follows: (i.) *6,063,859 shares of Common Stock being registered which are held by the owners of Ecological LLC in connection with the acquisition of substantially all of the assets of Ecological LLC;* (ii.) 2,*190,945 shares of Common Stock being registered held by the shareholders of Root9B LLC in connection with the acquisition of Root9B;* (iii.) *1,000,000 shares of Common Stock being registered hereby are issuable upon exercise of warrants granted to*

57

***board members for annual board service; (iv.) 300,000 shares of Common Stock being registered hereby are issuable upon exercise of warrants granted to two board members for additional services in 2011 related to merger processes; and (v.) 325,000 shares of Common Stock being registered hereby are issuable upon exercise of warrants granted to three agencies for outside services***;.

May 1, 2015 Prospectus, at 1 (emphasis added).

130.    The May 1, 2015 Prospectus stated the amount of the shares that each of the Selling Shareholders were registering and each of the stockholders were assumed to be selling. Notably, the Selling Stockholders listed in the May 1, 2015 Prospectus include:

(a)    22 individual/entities who received shares when Premier Alliance acquired Ecological LLC from its shareholders, including:

(i)    Centurion Holdings (a company in which Grano is the CEO, Chairman, and controlling member);

(ii)    Joseph C. Grano and Robert H. Silver, Trustees of The Grano Children's Trust dtd. December 13, 2012; and

(iii)    Brian King, the Company's COO.

(b)    Six individuals who received shares when Premier Alliance acquired root9B LLC from its shareholders, including:

(i)    Hipkins;

(ii)    Hipkins' relative, Erika Hipkins; and

(iii)    Michael Morris, root9B LLC's Chief Technology Officer.

(c)    Five then current and one former Board members of the Company who received shares related to their duties on the Board, including:

(i)    Pat Kolenik;

        (ii)     Cary Sucoff;

        (iii)    Isaac Blech;

        (iv)    Steve Yarbrough;

        (v)     Kevin Carnahan; and

        (vi)    Harvey Pitt.

131.　Furthermore, this chart represented that immediately after the offering described in the May 1, 2015 Registration Statement Amendment, that almost all of the Selling Stockholders would ***beneficially own 0%***.  The May 1, 2015 Prospectus stated that the Company ***assumed that the Selling Stockholders would be sell all their shares following the completion of the offering*** despite stating in a footnote to the chart that the Company is unable to determine the exact number of shares that will actually be sold or when or if sales will occur.

132.　The timing of the filing of the post-effective amendment on April 24, 2015 to register the Selling Stockholder's shares, which occurred at same time "in late April" (per the APT28 Report) that root9B purportedly discovered the planned Sofacy/APT28 cyberattack, is highly suspicious and indicative of the intent of the Defendants' intent or recklessness to undertake a scheme to defraud the Company's investors for their own financial gain.  The timing coupled with the fact that the purpose of this offering was not to raise proceeds for the Company in light of its continuing liquidity pressures further supports a strong inference of scienter.

133.　After the Company issued its May 12, 2015 Press Release, and the APT28 Report, along with Defendant Grano's and Harbaugh's statements during the May 14, 2015 Fox Business Interview, the Company's stock price increased on higher than average volumes and resulted in the Company's stock trading at its all-time high of $2.51 during intraday trading.

134.    However, before Defendants and the other Selling Stockholders could take full advantage of the artificially inflated stock prices as a result of the false and/or misleading statements contained in the May 12, 2015 Press Release, the APT28 Report, and the May 14, 2015 Fox Business Interview, the Krebs Article was published which informed the market of the falsity and misleadingness of the statements contained therein.

135.    The following chart reflects the artificial inflation of the Company's stock price as a result of May 12, 2015 Press Release, the APT28 Report, and the May 14, 2015 Fox Business Interview and the initial price corrections as result of the Krebs Article's publication, dissemination, and adoption in the market:



May 1, 2015 Prospectus, at 49-50.

### *Defendants Grano Timed His Purchase of root9B Shares to Occur Prior to the Publication of the May 12, 2015 Press Release and the APT28 Report*

136.     Furthermore, the size and timing of Grano's purchases shortly prior to the publication of the May 12, 2015 Press Release and the APT28 Report is indicative of a motivation to benefit financially from the Company's stock price while it was being inflated by the continued misrepresentations and omissions throughout the Class Period.

137.     As stated in the APT28 Report, the Company had discovered the purported planned

Sofacy/APT28 cyberattack at the end of April 30, 2015.

138.    In light of the forthcoming artificial price increase expected in the Company's stock price as a result of the disclosures to be made by root9B in the May 12, 2015 Press Release and the APT28 Report and on this confidential and non-public information, Grano purchased on April 30, 2015 an additional 110,000 shares in the Company. The purchase of 110,000 shares increased his beneficial ownership by over 3%, as compared to his beneficial ownership position immediately prior to these April 30, 2015 acquisitions.

139.    The following charts display Defendant Grano's insider transactions, as obtained from his SEC Form 4 filings for this two week period:

| Defendnat Grano | Date Bought | Quantity Purchased | Price Per Share |
|---|---|---|---|
| | 4/30/15 | 2,000 | $1.70 |
| | 4/30/15 | 55,000 | $1.74 |
| | 4/30/15 | 3,675 | $1.73 |
| | 4/30/15 | 45,400 | $1.74 |
| | 4/30/15 | 5,925 | $1.75 |

| Defendnat Grano | Date Bought | Quantity Purchased | Price Per Share |
|---|---|---|---|
| Total Purchases Within Two Weeks of May 12, 2015 | | 112,000 | |

140.    The timing of Grano's purchases serves as further indication that he decided to take advantage of the fact that the general public was unaware of the Cyber Solutions revenue source and was about to unleash false and/or misleading statements into the market which he knew or recklessly disregarded would artificially increase the Company's stock price.   Beginning approximately two weeks before the publication of the May 12, 2015 Press Release and the APT28 Report where Defendants that the Company had uncovered a purported planned attack against the international banking institutions by a Russian-sponsored hacking group, Grano purchased 112,000 shares of root9B stock.   Grano's trading history supports the conclusion that he was aware of that the materially false and/or misleading statements contained in the May 12, 2015 Press Release and the APT28 Report and that such statements were to cause an artificial inflations in the Company's stock price.

### *Defendant Smith's Abrupt Resignation*

141.    The Individual Defendants' scienter is further evident from Defendant's Smith's unexpected and unexplained resignation from the Company on November 11, 2015.  On November 17, 2015, the Company announced that Smith had abruptly resigned as CFO from root9B.   No reason was provided and, significantly, the Company failed to state that the resignation was for personal reasons or that it did not have anything to do with the way in which root9B LLC / the Cyber Solutions business segment earned or disclosed its revenues during the Class Period.

142.    Furthermore, Smith's resignation detrimentally impacted him financially as the option to purchase 350,000 shares granted to him upon becoming the Company's CFO was to vest over a four-year period.  Having left prior to the four-year period, Smith stood to lose substantial amounts from the options unvested on the 350,000 shares as well as his lucrative salary.

143.    Smith's abrupt resignation gives rise to a strong inference of scienter because: (i) Smith was directly involved in the issuance of at least *four* for the Company's periodic filings with the SEC which contained false and/or misleading statements or omissions concerning the sources of the Cyber Solution segment's revenues; (ii) as CFO, Smith was aware of the sources of the Company's Cyber Solutions segment's sources of revenues and costs of goods sold and therefore knowingly or recklessly failed to disclose that: (a) the hardware was not proprietary; (b) that the hardware was low-margin and constituted a large portion of the Cyber Solutions revenues; (c) the Company acted solely as a reseller of the hardware; and/or (d) the Company was moving away from reselling the hardware.

144.    Throughout the Class Period, the Individual Defendants acted with the intent to defraud, or with a reckless disregard towards the potential of defrauding, Plaintiff and other members of the class by disseminating false and misleading statements and/or omissions relating to, among other things, (i) the Cyber Solution's hardware offering being "proprietary" and differentiated the Cyber Solutions business segment from its competitors; and (ii) the discovery of planned cyberattack against financial institutions that the Company repeatedly claimed originated from Russian state-sponsored hacking group commonly known as Sofacy/APT28.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired root9B securities during the Class Period, and were damaged by the alleged corrective disclosures.   Excluded from the Class are the Individual Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

146.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, root9B securities were actively traded on over-the-counter market.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by root9B or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.   As of May 5, 2015, root9B had approximately 72.45 million shares of common stock outstanding.   Upon information and belief, these shares are and/or were held by thousands if not millions of individuals located geographically throughout the country and possibly the world.   Joinder would be highly impracticable.

147.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Individual Defendants' wrongful conduct in violation of federal law that is complained of herein.

148.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has

no interests antagonistic to or in conflict with those of the Class.

149.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by the Individual Defendants' acts as alleged herein;

- whether statements made by the Individual Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of root9B;

- whether the Individual Defendants caused root9B to issue false and misleading statements during the Class Period;

- whether the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of root9B securities during the Class Period were artificially inflated because of the Individual Defendants' conduct complained of herein; and

-  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE**

151.    At all relevant times, the market for root9B's common stock was an efficient market for the following reasons, among others:

(a)     During the Class Period, on average, approximately 120,000 shares of root9B's common stock were traded on a weekly basis;

(b)     root9B regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Numerous firms were active market-makers in root9B stock at all times during the Class Period;  and

(d)     The Company's statements concerning the discovery of a purported yet to occur state-sponsored attack by a Russian hacking group was rapidly reflected in and incorporated into the Company's stock price during the Class Period.  Furthermore, other unexpected material news about root9B was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

90.     As a result of the foregoing, the market for root9B's securities promptly digested current information regarding root9B from all publicly available sources and reflected such information in root9B's securities price.  Under these circumstances, all purchasers of root9B's securities during the Class Period suffered similar injury through their purchase of root9B's securities at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

152.     During the Class Period, as detailed herein, Defendants root9B and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of root9B's securities and operated as a

fraud or deceit on Class Period purchasers of root9B's securities by materially misleading the investing public. Later, when root9B and the Individual Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of root9B's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of root9B's securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

153.    On May 19, 2015, root9B's stock price closed at $2.45 per share. On May 20, 2015, following the publication of the Kreb's Article, root9B's stock declined by $0.12 per share, approximately 4.9% on nor than normal volume of approximately 2.8 million shares to close at $1.63 per share on June 10, 2014.

154.    On Friday, June 12, 2015, the Company's stock priced closed at $1.87 on volume of 146,900 shares. On Monday, June 15, 2015, in response to the *Seeking Alpha* Article being published, the Company's stock price dropped $0.17, or approximately 9.1%, on heavy volume of approximately 1.488 million shares to close at $1.70. The average daily trading volume for root9B shares in the three months preceding June 15, 2015 was 177,619 shares. root9B's stock price continued to decline on heavy volume over the next week, closing at $1.02 on June 23, 2015 after heavy trading of 2,251,700 shares on that day.

## THE SAFE HARBOR AND BESPEAKS CAUTION DOCTRINES DO NOT APPLY

155.    The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In

addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocean Power who knew that those statements were false, misleading or omitted necessary information when they were made.

156.   The Individual Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of root9B and/or root9B LLC who knew that the statement was false.  Alternatively, none of the historic or present-tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**FIRST CLAIM**

**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

157.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

158.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

159.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of root9B securities; and (iii) cause Plaintiff and other members of the Class to purchase root9B securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

160.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for root9B securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about root9B's finances, technology, and the purported Sofacy attack.

161.     Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

162.     Information showing that Defendant acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior officers and/or directors of root9B, Defendants Grano and Smith had knowledge of the details of root9B's internal affairs.

163.     Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Grano were able to and did, directly or indirectly, control the content of the statements of root9B.  As officers and/or directors of a publicly-held company, Grano and Smith had a duty to disseminate timely, accurate, and truthful information with respect to root9B's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading reports, releases and public

statements, the market price of root9B securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning root9B's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased root9B securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Defendants and were damaged thereby.

164.    During the Class Period, root9B securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of root9B securities at prices artificially inflated by Defendants wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of root9B securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of root9B securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

165.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

166.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company

had been disseminating misrepresented financial statements to the investing public.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

167.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

168.   During the Class Period, the Individual Defendants participated in the operation and management of root9B, and conducted and participated, directly and indirectly, in the conduct of root9B's business affairs.  Because of their senior positions, they knew the adverse non-public information about root9B's operations, finances, and the Company's purported discovery of a planned attack by Sofacy/APT28.

169.   As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to root9B's finances, operations and press releases, and to correct promptly any public statements issued by root9B which had become materially false or misleading.

170.   Because of their positions of control and authority as senior officers and/or directors, and/or controlling shareholders, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which root9B disseminated in the marketplace during the Class Period concerning root9B's sources of revenues, products, finances, and purported discovery of a planned attack by Sofacy/APT28. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause root9B to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of root9B within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of root9B securities.

171.     Each of the Individual Defendants, therefore, acted as a controlling person of root9B.  By reason of their senior management positions and/or being directors or controlling shareholders of root9B, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, root9B to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of root9B and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

172.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by root9B.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

[Signature blocks on following page]

DATED: January 4, 2016                    **THE SHUMAN LAW FIRM**


                                          /s/ Kip B. Shuman                     
                                          Kip B. Shuman
                                          Rusty E. Glenn
                                          885 Arapahoe Avenue
                                          Boulder, Colorado 80302
                                          Telephone:  303-861-3003
                                          303-484-4886 (fax)
                                          kip@shumanlawfirm.com
                                          rusty@shumanlawfirm.com

                                          *Liaison Counsel for the Class and Lead Plaintiff*
                                          *David Hampton*


                                          **LEVI & KORSINSKY LLP**
                                          Nicholas I. Porritt, Esq.
                                          Alexander A. Krot III, Esq.
                                          1101 30th Street NW, Suite 115
                                          Washington, D.C. 20007
                                          Phone: (202) 524-4290
                                          Fax: (202) 333-2121
                                          Email: nporritt@zlk.com
                                          Email: akrot@zlk.com

                                          *Counsel for David Hampton and Lead Counsel for*
                                          *the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with this Court on January 4, 2016 through the

CM/ECF system and will be sent electronically to all registered participants as identified on the

Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered

participants.

/s/      *Rusty E. Glenn*