**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 15-cv-02152-MSK-MEH**

**DAVID HAMPTON, individually and on behalf of all others similarly situated,**

    **Plaintiff,**

**v.**

**ROOT9B TECHNOLOGIES, INC.;
JOSEPH J. GRANO, JR.; and
KENNETH T. SMITH,**

    **Defendants.**

---

**OPINION AND ORDER GRANTING MOTION TO DISMISS**

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff David Hampton's Objections **(# 54)** and the Defendants' Objections **(# 55)** to the Magistrate Judge's August 4, 2016 Recommendation **(# 51)** that the Defendants' Motion to Dismiss **(# 35)** be granted in part and denied in part, and the parties' respective responses **(# 56, 57)**. Also pending is the Magistrate Judge's Recommendation **(# 50)** that the Court grant Mr. Hamptons' Motion to Strike **(# 40)** certain exhibits attached to the Defendants' Motion to Dismiss. No party has objected to that Recommendation.[1]

---

[1] The Court has reviewed the Recommendation that Mr. Hampton's Motion to Strike be granted under the otherwise applicable *de novo* standard, and finds that upon such review, it agrees with the Magistrate Judge's analysis and conclusions. Accordingly, the Court grants Mr. Hampton's motion to strike the extraneous exhibits.

## FACTS

Although the Amended Complaint **(# 34)** is lengthy, it describes a fairly simple set of facts. Defendant Root9B Technologies, Inc. ("Root") is a company offering computer security consulting services for businesses. Plaintiff, Mr. Hampton[2], alleges that, during the period from October 17, 2014, to June 15, 2015, Root was suffering from weak cash flows and was trying to attract the interest of additional investors. To do so, Mr. Hampton alleges, the Defendants (through their officers, including those individuals named as Defendants herein) made several false and misleading statements in connection with the sale of Root's stock. Those statements can be grouped into two categories.

First, Mr. Hampton contends that Root repeatedly claimed in its SEC filings that it "has proprietary hardware and software designed to combat the new methodologies being utilized by state-sponsored and sophisticated individual hackers" (or statements containing similar language). In actuality, according to Mr. Hampton, the "proprietary hardware and software" Root was referring to was simply a product produced by another entity, for which Root was acted as a reseller. Further, Mr. Hampton alleges (somewhat conclusorily) that the hardware and software were not particularly designed to address the type of security threats that Root's

---

[2]   This case was initially assigned to Magistrate Judge Hegarty under the terms of the Pilot Project to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges. During the time that Judge Hegarty was presiding over the case, he granted **(# 18)** Mr. Hampton's request to serve as lead plaintiff **(# 14)** on behalf of the putative class described in the Amended Complaint. Subsequently, the Defendants indicated **(# 20)** that they did not consent to the case being assigned to a Magistrate Judge under 28 U.S.C. § 636(c), and the case was reassigned **(# 24)** to the undersigned.

At this point in time, no party has addressed the continuing viability of the Magistrate Judge's appointment of Mr. Hampton as Lead Plaintiff in light of the parties failure to consent under § 636(c), nor has Mr. Hampton sought actual certification by the Court of the class he purports to represent. For purposes of this Opinion only, the Court will assume, without necessarily finding, that Mr. Hampton remains the duly-designated representative of the class identified in the Amended Complaint.

statements described. Mr. Hampton contends that Root's statements to this effect appear in its October 17, 2014 Form 8-K; its November 14, 2014 Form 10-Q; its March 31, 2015 Form 10-K; and its May 15, 2015 Form 10-Q. (The Court will refer to this strand of statements as being "the SEC filings claim," as all of the alleged false statements concerning "proprietary hardware and software" were contained in Root's formal SEC filings.)

Second, on May 12, 2015, Root issued a press release announcing that it had discovered evidence that a Russian hacking group known as Sofacy (sometimes also known as APT28) was planning to target several large international banks. On the same date, Root published a lengthy report that described its findings and conclusions. Two days later, Defendant Grano, Root's CEO, and another Root officer appeared in a televised interview on the Fox Business network, during which Mr. Grano repeated Root's position that the evidence pointed to "state-sponsored organizations" being involved in the hack. Mr. Hampton alleges that, in actuality, the evidence that Root discovered pointed to the work of an existing network of "run-of-the-mill" Nigerian bank scammers that had been known to exist for nearly a decade, not to the Russian "state-sponsored" Sofacy group. A cybersecurity journalist reported his belief that Root had misidentified the hackers in an article published on May 20, 2015 ("the Krebs article").

Due to the notoriety resulting from Root's May 12, 2015 press release, Root's stock experienced a significant price increase. But after the Krebs article cast doubt on Root's conclusions, the stock price to slumped, and after a second article on June 15, 2015 ("the Pump Stopper article") further questioned Root's business practices, Root's stock price slumped further.

Based on these allegations, Mr. Hampton, as named representative of a putative class of Root shareholders during the pertinent time period, brings two claims: (i) securities fraud, in

violation of Section 10(b) of the Securities Exchange Act,15 U.S.C. § 78j(b), against all Defendants; and (ii) control person liability under Section 20 of the Exchange Act, 15 U.S.C. § 78t, against the individual Defendants.

The Defendants moved to dismiss **(# 35)** Mr. Hampton's claims, arguing that: (i) Mr. Hampton failed to plead sufficient facts to show that either strand of statements was actually false or misleading; (ii) Mr. Hampton failed to adequately plead facts showing the Defendants' scienter; and (iii) Mr. Hampton failed to adequately plead loss causation, in that the two articles that Mr. Hampton relies upon as revealing Root's misstatements are both premised upon publicly-available information.

The Court referred that motion to the Magistrate Judge for a recommendation, and on August 4, 2016, the Magistrate Judge recommended **(# 51)** that the Defendants' motion be granted in part and denied in part. Specifically, the Magistrate Judge found that: (i) Root's press release and report about the Sofacy event were statements of fact, not mere expressions of opinion, and thus, the statements could be said to be false; (ii) the question of whether the Krebs article was reliable evidence of the falsity of the Sofacy press release and report was a matter to be resolved by the factfinder; (iii) Mr. Hampton adequately alleged that the Pump Stopper article revealed that Root did not possess "proprietary hardware," and the reliability of that article must be resolved by the factfinder; (iv) that Mr. Grano's statement during the televised interview that he "was aware of what [Root] found," coupled with the allegations that Root's statements about the Sofacy incident were false, was sufficient to allege Mr. Grano's scienter; (v) that Mr. Hampton had failed to plead facts sufficient to show that Mr. Smith, as CFO, would have known about the falsity of the Sofacy report, and thus, failed to plead Mr. Smith's scienter as to that strand of statements; (vi) that statements about Root's "proprietary hardware," attributed to Mr.

Smith in the Pump Stopper article, are sufficient to allege his knowledge for purposes of a claim premised upon that strand of false statements; (vii) Mr. Hampton could not rely upon the "core operations" doctrine to assume that Mr. Grano would have known that Root did not actually have "proprietary hardware," requiring dismissal of the claims against Mr. Grano relating to the SEC filings; (viii) Mr. Hampton's failure to allege that the "proprietary hardware" statements in the SEC filings caused an increase in stock price warrants the conclusion that Mr. Smith lacked the motive and opportunity to deceive shareholders, warranting dismissal of the claims relating to the SEC filings in their entirety; (ix) the stock price increase associated with the Sofacy report was sufficient to allege Mr. Grano's scienter as to those statements; (x) the Krebs article contained sufficient non-public information, not previously published by Root, to permit the conclusion that it was the cause of the stock price drop that occurred shortly thereafter, thus alleging the requirement of loss causation.  Thus, the Magistrate Judge recommended that only Mr. Hampton's claims against Root and Mr. Grano proceed, and that these be limited to the statements concerning the Sofacy incident.

Both sides filed timely Objections to the Magistrate Judge's Recommendation.  Mr. Hampton's Objections **(# 54)** argue that: (i) the Magistrate Judge erred in finding that Mr. Smith lacked scienter when making representations about Root's "proprietary hardware" when the Magistrate Judge previously concluded that Mr. Smith had admitted to the author of the Pump Stopper article that the hardware in question was not proprietary; (ii) the Magistrate Judge erred in finding that the absence of a drop in stock price – and thus, an absence of "motive" – relating to the "proprietary hardware" statements in the SEC filings was sufficient to otherwise defeat a showing of Mr. Smith's scienter as to those statements; (iii) even if the assertions in SEC filings about Root's "proprietary hardware" did not cause the stock price to rise, the Amended

Complaint alleges that the day after the Pump Stopper article appeared -- thus dispelling Root's prior assertions of "proprietary hardware"-- Root's stock price dropped over 9%, demonstrating that the false statements were preserving an artificial inflation of the stock price; and (iv) that same drop in stock price after the Pump Stopper article sufficiently alleges loss causation for the SEC filing claims.

The Defendants' Objections **(# 55)** argue that: (i) as to the SEC filings claims, the Magistrate Judge erred in finding sufficient allegations that the "proprietary hardware" statements were false, in that the Pump Stopper article do not necessarily refute the notion that Root does indeed possess "proprietary hardware," that Root's subsequent deletion of the "proprietary hardware" statement from subsequent SEC filings does not support an inference that the previous use of that phrase was false, and that the fact that the stock price dropped after the Pump Stopper article appears does not suffice to suggest that the "proprietary hardware" statements were false; (ii) to the extent that the Sofacy report may have been false, the Magistrate Judge erred in finding that either of the individual Defendants are responsible for the contents of that report; (iii) the Magistrate Judge erred in concluding that the Sofacy report was a statement of fact, rather than one reflecting Root's opinion as to the identity of the hackers, and that in any event, Mr. Hampton does not allege the actual identity of the hackers, leaving the question of whether Root's identification of them was correct unresolved; (iv) the Magistrate Judge failed to sufficiently apply the requirement of a <u>strong</u> showing of scienter as it related to both Mr. Grano and the Sofacy report and Mr. Smith and the SEC filings; and (v) the Magistrate Judge erred in finding that the Krebs article was a "corrective disclosure" that could support the loss causation element, insofar as the Krebs article only contained information that was already public.

## ANALYSIS

### A. Standard of review

The Court reviews the objected-to portions of a Recommendation *de novo*. Fed. R. Civ. P. 72(b).

Neither party objected to the Magistrate Judge's recitation of the standards applicable to a motion under Fed. R. Civ. P. 12(b)(6), the elements of a Section 10(b) claim, or the requirement that the plaintiff must plead the elements of falsity and scienter with particularity. Accordingly, the Court adopts the Magistrate Judge's recitation of these standards as if set forth herein.

### B. Falsity

Upon *de novo* review, this Court agrees with the Defendants that Mr. Hampton's allegations are insufficient to allege that either strand of representations is false. The Court addresses each strand separately.

#### 1. The SEC filings claim

Through briefing on the Motion to Dismiss, Mr. Hampton seems to have narrowed his claim regarding the SEC filings to the single assertion by Root that it has "proprietary hardware" designed to detect state-sponsored hacking.[3] In alleging that this assertion is false, Mr. Hampton appears to rely on two facts: (i) the Pump Stopper article, and (ii) Root's subsequent deletion of that phrase form its future SEC filings. Because Mr. Hampton's theory appears to be that the

---

[3] The Court has profound doubt that the phrase "proprietary hardware," as used in the SEC filings, is sufficiently specific as to even support a fraud claim. Root's filings do not identify or otherwise describe this hardware or the particular function it plays in Root's operations, nor do those filings offer any elaboration about what makes the hardware "proprietary" (much less suggest which of that word's meanings are being invoked). The absence of any meaningful particularities suggests that the phrase might more properly be understood to be non-factual puffery, rather than a specific assertion of fact that Root intended potential investors to rely upon.

latter occurred as a direct result of the former, the Court focuses its attention on the contents of the Pump Stopper article.

The pertinent portion of the Pump Stopper article reads as follows[4]:

> . . . I felt compelled to double check with the company in case I missed something, how can there be nothing of value at Root. I called Ken Smith, Root's CFO to get more perspective on the paltry $ 4.07 million in shrinking, unprofitable cyber revenue and the company's product claims.
>
> I was told a large portion of "cyber" was actually a onetime low margin hardware installation, projects Root will be apparently moving away from going forward so it seems we can expect even more cyber revenue declines. Best I can tell, another component of revenue is largely what appears to me an old training and certification service for a product Root acts as a reseller for. During our conversation, Root's CFO Ken didn't even seem to know what the product was called! Root's investor presentation is also literally one of the worst presentations I've ever seen in my life, full of useless blathering about the "TAM" and listing global issues without discussing what Root actually does in any useful detail and ZERO discussion of any of Root's financials or investment aspects at all!
>
> Doing more work, despite CFO's apparent ignorance and vague company rambling, it appears to me Root's cyber claims are also based on a product called Digital Shield, a product Root resells, and installs for other companies and municipalities with a price point of $3,600 - Root is going to have to do an impossible amount of reselling this old "training module" to justify the current market capitalization of $134 million!

Mr. Hampton appears to equate Root's reference to "proprietary hardware" in its SEC filings with the Pump Stopper article's reference to "a onetime low margin hardware installation." Beyond the fact that both phrases include the word "hardware," it is entirely unclear to the Court how Mr. Hampton reaches that conclusion. Nothing in the use of the phrase

---

[4] For purposes of consistency, the Court has replaced all references in the article to Root by its stock symbol, RTNB, with, simply, "Root."

"proprietary hardware" in the SEC filings suggests that Root was using the phrase to describe hardware that it was installing for clients, as opposed to, say, hardware that Root maintained in its own offices and used for its own analytical purposes. Although it is possible that the hardware described in the Pump Stopper article is the same hardware that Root was describing as "proprietary," Mr. Hampton's obligation under Fed. R. Civ. P. 12(b)(6) requires him to plead something more than the mere possibility that the two phrases describe the same thing; Mr. Hampton must plead facts that make it plausible to conclude that the same hardware is at issue in both statements. *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950-51 (2009).

Moreover, even assuming that Mr. Hampton is correct that the Pump Stopper article correctly identifies the "proprietary hardware" discussed in Root's SEC filings as the "low margin hardware installation" project, those two descriptions are not inherently inconsistent. A given piece of hardware can be both "proprietary" and "low margin" at the same time. For example, razor handles and computer printers may have "proprietary" features, but are often sold at- or near-cost in order to lock-in customers to more lucrative purchases of blades or ink. It may be that Root was sacrificing its profit margins on the sale of the proprietary hardware as a loss leader in order to increase the volume of sales of that hardware or to induce hardware buyers to purchase more profitable services as well. Absent evidence that reveals that the "proprietary hardware" in question was off-the-shelf equipment equally available to Root's customers or competitors, Mr. Hampton has failed to plead facts that demonstrate that Root's claim of having "proprietary hardware" were false.

The fact that Root deleted the "proprietary hardware" reference from its SEC filings after the Pump Stopper article appeared does not materially add to Mr. Hampton's allegations. Root's SEC filings after this date delete not only the reference to "proprietary hardware," but an entire

9

block of text that promoted several ways in which Root believed its business was different from its competition. Although Mr. Hampton surmises that Root deleted the reference because the Pump Stopper article has exposed the falsity of that claim, that is nothing more than speculation for which Mr. Hampton points to no corroborating evidence. Moreover, even if one adopts Mr. Hampton's theory that the "low margin hardware installation" described by the article is the same "proprietary hardware" claimed by Root, Root's later SEC filings seem to address that issue head-on, explaining that Root's 2014 revenues included "revenue . . . from hardware re-sales which was not repeated in" subsequent quarters, and that such re-sales[5] are "planned to be discontinued." This would explain why Root ceased touting its hardware as "proprietary" in late-2015: because it was no longer intending to rely upon such hardware sales as a major business strategy.

Accordingly, the Court finds that Mr. Hampton has failed to plead facts sufficient to state a claim that Root's claims in its 2014-15 SEC filings that it had "proprietary hardware" sufficiently alleges a statement that could be considered false. All claims premised on these statements are dismissed.

2. The Sofacy report

The Court then turns to the question of whether Mr. Hampton has alleged facts sufficient to demonstrate that the Sofacy report and accompanying statements were false. For purposes of this analysis, the Court adopts the Magistrate Judge's findings that Root's identification of Russian hackers as the culprits constitutes an assertion of fact, not a mere statement of opinion.

---

[5] Although Mr. Hampton has not necessarily argued as much, this Court sees no reason why Root's "re-sale" of hardware manufactured by another entity prevents Root from claiming that hardware as "proprietary." In common parlance, "proprietary" is generally understood to mean "exclusive" or "unique." Thus, so long as Root was the exclusive re-seller of the hardware at the time it made the statements, the fact that the hardware had been manufactured, or even previously sold, by another entity would not render Root's claims false.

Nevertheless, the Court finds that Mr. Hampton has not alleged facts that show that this statement is factually incorrect.

To plead that the Sofacy report was false, Mr. Hampton relies entirely on the fact that the Krebs article disagrees with Root's conclusions. But the Krebs article does not establish that Root's conclusions are false; it merely offers a different explanation – one that its author believes is more plausible. The Krebs article acknowledges that Root correctly identified certain e-mail addresses and physical addresses that were used to hack the financial institutions. And the Krebs article acknowledged that the e-mail addresses discovered by Root were connected, to some degree, with a "domain name server" that was known to be associated with the Sofacy group. The Krebs article argued, however, that this same domain name server was <u>also</u> known to be associated with other hacker groups as well, and went on to suggest that some of the e-mail addresses in question were known to have been used by non-Russian scam artists in the past. (Notably, even the Krebs article's author hedged his conclusions that Root was incorrect, suggesting that his explanation would be the more plausible one, "[u]nless [Root] is holding back key details about their research" – a subject on which he does not opine.)

By means of analogy, Root essentially traced a shipment of stolen goods to the loading dock of a warehouse, and observed that Russian mobsters have been known to use that warehouse; the Krebs article points out that the Mafia, the Yakuza, and Mexican drug cartels have also been known to use the warehouse, and that an alias used on some of the mailing labels on the shipment had previously been used by the Yakuza. Beyond pointing out an alternative, perhaps more persuasive explanation, the Krebs article merely accuses Root of sloppy detective work or of prematurely jumping to a conclusion about the identity of the culprit.. Neither the article nor Mr. Hampton suggest that the true identity of the hackers became or ever will become

11

known, or that the computer security community ever settled on a generally-accepted conclusion as to the matter. Thus, the question of whether the hackers were Russians, Nigerians, both, or neither remains an unsolved mystery. In such circumstances, one cannot say that one side's version of events is "true" and the other's is "false"; one can only critique the other side's reasoning or investigation, and decide that one explanation is more persuasive than the other.

As such, because the Krebs article alone does not establish that Root's conclusion as to the true identity of the hackers is "false" – as opposed to "unpersuasive" – Mr. Hampton has not alleged facts sufficient to premise a securities fraud claim on the Sofacy report. The Defendants are entitled to dismissal of those claims.[6]

Because the Court finds that Mr. Hampton's claims are subject to dismissal in their entirety, it need not reach the Defendants' remaining Objections, nor those of Mr. Hampton.

---

[6] Even assuming that Mr. Hampton could plead that, as a factual matter, Root incorrectly identified the Russians as the perpetrators of the hack, the Court has profound doubts that his allegations regarding the Defendants' scienter would also be sufficient. The Krebs' article essentially accuses Root of sloppy detective work and premature accusations – that is, accusations of negligent analysis. But scienter requires knowing or reckless falsity. *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003). Thus, Mr. Hampton would have to allege facts suggesting that: (i) Root's analysts either purposefully fabricated the Sofacy analysis to blame Russian hackers, or performed the analysis so deficiently that a reasonable observer would understand them to have performed no meaningful analysis at all; and (ii) that the Defendants responsible for issuing the report and press release knew or recognized the defects in the analysis. Mr. Hampton's allegations, which essentially rely entirely on the Krebs article's accusations, thus suggest only that Root's analysis was negligent, not knowing or reckless.
Moreover, the Court has some doubt that the publication of the Krebs article, which relied exclusively on publicly-available information -- the contents of the Sofacy report itself and previously-published investigations into scammers using the same server and e-mail addresses -- can constitute the type of "corrective disclosure" that would suffice to demonstrate loss causation. Even assuming it was sufficient, the class period applicable to this litigation would be dramatically shorter than that suggested by Mr. Hampton, encompassing only those who bought Root's stock between the May 12, 2015 Sofacy report and the May 20, 2015 Krebs article, and sold the stock shortly after May 20. Notably, Mr. Hampton did not make any purchases or engage in any sales during that period. (Indeed, Docket # 14 at 23 suggests that Mr. Hampton made several additional purchases of Root's stock the day after the Krebs article was published.)

## **CONCLUSION**

For the foregoing reasons, the Court **ADOPTS** the Recommendation **(# 50)** and **GRANTS** Mr. Hampton's Motion to Strike **(# 40)**. The Court **SUSTAINS IN PART** the Defendants' Objections **(# 55)** and **OVERRULES IN PART** the remaining Objections by both sides **(# 54, 55)** as moot. The Court **ADOPTS IN PART** and **REJECTS IN PART** the Recommendation **(# 51)**, and **GRANTS** the Defendants' Motion to Dismiss **(# 35)**, finding that Mr. Hampton has not adequately alleged any false statement of fact by Root. All claims in this action are **DISMISSED** for failure to state a claim, and the Clerk of the Court shall close this case.

Dated this 21st day of September, 2016.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge